710 KENTUCKY REPORTS. [Vol. 138.

Barber's Ex'r v. Baldwin, et al.—Barber, et al. v. Newman, et al.

CASE 91.—PROCEEDING BY CECILIA BARBER'S EX'RS TO PROBATE HER WILL IN WHICH AMELIA L. BALDWIN AND OTHERS APPEARED AS CON-TESTANTS.—June 1, 1910.

# Barber's Exr v. Baldwin, &c.—Barber, &c. v. Newman, &c.

Appeals from Nelson Circuit Court.

SAMUEL E. JONES, Circuit Judge.

Judgment for defendants and plaintiffs 'appeal.— Affirmed.

1. Wills—Probate—Contests—Suit to Construe Will—Effect.— The pendency of an appeal by the propounders of a will appealing from a judgment rejecting certain clauses of the will does not estop the propounders from maintaining a suit to construe the will, but the prosecution of the suit may operate. as an abandonment of the position taken by propounders in the will contest, which question may be raised in that con test only.

2. Wills—Construction—Intention of Testator.—Each portion of a will must be read in connection with the remaining portion, and the intention of testator must be gathered from a consideration of the whole will, and, to properly construe the concluding part of a sentence, it must be read in connection with the preceding part thereof.

3 Wills—Codicil—Construction—Residuary Clause.—Testatrix made bequests to relatives and friends and to a daughter and her children, and to a son and his children. The provision in the will that, on the death of any relative or friend or on the death of her daughter and her children during the lifetime of the testatrix, the legacies should go to the residuary legatees, and the provision that the distribution of the residuary estate to her son and his children, were rejected because procured by undue influence. By a codicil she revoked bequests to some of the children of her son, and provided that they should take no portion of the residuary estate, and provided that the residue should be distributed

among the other devisees as named in the will. Held, that the codicil merely made changes as to legacies provided for in the will, and did not dispose of the residuary estate.

4. Wills—Probate—Undue Influence—Evidence.—In a suit for the probate of a will contested on the ground of undue influence, evidence held to authorize the submission of the issue to the jury.

5. Wills—Probate—Contests—Evidence.—In will contests involving the questions of testamentary capacity and undue influence, the evidence is permitted to take a wide range necessarily covering much of the life history of testator, and going largely into the relations existing between persons dealing with him.

EDELEN & DAVIS, FAIRLEIGH, STRAUS & FAIRLEIGH, WILLIAM McCHORD and NAT W. HALSTEAD for appellants.

JOHN A. FULTON, KELLY & CHERRY and E. E. McKAY for appellees.

OPINION OF THE COURT BY JUDGE LASSING—Affirming.

In 1893 P. S. Barber died intestate, a resident of Nelson county, Ky. He left a large estate, variously estimated at from $360,000 to $450,000. His property consisted in the main of real estate located in Nelson county and Louisville, Ky., Chicago, Ill., Bullitt county, Ky., and in the states of Tennessee and Mississippi. He left surviving him a wife, Cecilia Barber, and two children—a son, John R. Barber, and a daughter, Amelia L. Baldwin. Shortly after his death, an agreement was made and entered into between his wife and children, whereby each took a one-third interest in the estate of P. S. Barber, deceased. This agreement was evidenced by a writing signed by the three, and, in pursuance of said agreement, the lands and personal estate owned by P. S. Barber were divided. They interchanged deeds among themselves, so that each was given an

absolute title to that portion of the property which fell to him or her. In this division the valuation which they placed upon the property for the purpose of equalizing it among themselves was $120,000 per share. In May, 1908, Cecilia Barber died, testate. Her will was probated in the county court in due time, and her daughter, Amelia L. Baldwin, prosecuted an appeal from the order of the Nelson county court probating said will, and sought to have the will canceled and set aside on the ground that her mother did not have sufficient mentality to make same, and that she was unduly influenced in the execution thereof. Shortly after this contest was instituted, Mrs. Baldwin died, and the suit was revived in the name of her children and heirs at law. Her husband had died a short while before her mother. This will was executed in 1897, at which time the testatrix, Mrs. Cecilia Barber, was 78 years old. By this will, as originally drawn, she attempted to dispose of her entire estate, which at that time was, by her counsel, estimated to be of the value of at least $135,000. Of this sum she gave to churches and charities $5,800, to the family of her daughter, Mrs. Baldwin, $26,000, to the family of John R. Barber, $53,000, and to various friends, $9,500. She provided that, if any of the children of her daughter, Mrs. Baldwin, died before the testatrix, the share or interest of such one should become a part of her residuary estate, all of which she devised to her son John R. Barber and his family, ratably according to the interest which she had given them in her estate. A son of Mrs. Baldwin, Lee Baldwin, to whom she had given $15,000, died before his grandmother, and this $15,000 therefore passed into the residuary fund. Several minor changes were made in her will by codicils,

which were executed at various times between the execution of this will in 1897 and her death in 1908, but the codicils in the main relate to minor changes, and do not materially change the main purpose of the testatrix as expressed in the will as originally drawn. Under it, at the date of her death, the children of her daughter received something like $11,000, and her son and his children and grandchildren received the balance, amounting to more than $100,000, after the special bequests to friends, churches, and charities had been satisfied. It is of this gross inequality that Mrs. Baldwin complained. It appears from the record that shortly after her husband's death Mrs. Barber had executed a will in which she disposed of her estate along practically the same lines as she did in the will under consideration. This first will was executed in 1894. Two codicils were drawn to it, and when, in 1897, she desired to make still further changes in her will, after consulting with her attorney, she directed the will in contest drawn.

The following is the will in question with the various codicils thereto:

"I, Cecilia Barber, of Bardstown, Nelson county, Kentucky, do make and publish this, my last will and testament, by which I dispose of my entire estate, and revoke all wills or codicils heretofore made by me.

"Paragraph First.

"Item 1st. It is my will that all my just debts, funeral expenses and cost of administration be paid.

"Item 2nd. To St. Joseph's Catholic Church at Bardstown, Kentucky, I bequeath the sum of $3,000.

"Item 3rd. To St. Rose Catholic Church, of Washington county, Kentucky, I bequeath the sum of $500.

"Item 4th.   To the Catholic Church at Frederick-town, Washington county, Kentucky, I bequeath the sum of $500.

"Item 5th.   To the Catholic Church at Springfield, Kentucky, I bequeath the sum of $500.

"The amounts bequeathed by items 2d, 3d, 4th and 5th of this, the first paragraph of this will, are to be expended by the respective pastors of said churches, or their successors, for masses for the benefit of my late husband, Philetus S. Barber's soul, and for the benefit of my soul.

"Item 6th.  To the Rev. ·J. C. O'Connell I bequeath the sum of $500 as a token of my appreciation of the kindness shown and consolation given my husband and myself during the time of our affliction.

"Item 7th.  To St. Vincent's Orphan Asylum I bequeath the sum of $500.

"Item 8th.  To St. Joseph's Orphan Asylum I bequeath the sum of $300.

"Item 9th.   To the pastor of St. Joseph's Catholic Church, of Bardstown, Ky., or his successor, I bequeath the sum of $700, in trust, to be by him expended as he may deem best for the benefit of the poor people of Bardstown, Kentucky.

"Item 10th.  To the pastor of St. Joseph's Catholic Church, of Bardstown, Ky., or his successor, I bequeath the sum of $300, in trust, to be by him invested in some safe interest bearing security, the income from which he will expend in keeping the lot in which my husband is buried in proper condition and repair.

"Paragraph Second.

"Item 1st. To my niece, Kate Lancaster, I bequeath the sum of $3,000.

"Item 2d. To my niece, Lillie Lancaster, I bequeath the sum of $3,000.

"Item 3d. To my niece, Rose Mitchell, I bequeath the sum of $3,000.

"Item 4th. To Mansell Mitchell I bequeath the sum of $500.

"Item 5th. To my sister, Lettie Hamilton, I bequeath the sum of $500.

"Item 6th. To my brother, Baker Smith, I bequeath the sum of $500.

"Item 7th. To John Lancaster I bequeath the sum of $500.

"Item 8th. To Geo. Lancaster, son of John Lancaster, I bequeath the sum of $200.

"Item 9th. To my brother, William Smith, I bequeath the sum of $500.

"Item 10th. To Garnett Dudley I bequeath the sum of $300.

"Item 11th. To Mrs. Sallie Viglina I bequeath the sum of $333.33.

"Item 12th. To Edith Viglina I bequeath the sum of $333.33.

"Item 13th. To Pauline Viglina I bequeath the sum of $333.33.

"Item 14th. To Peara Viglina I bequeath the sum of $300.

"Item 15th. To my little friend 'Jack' McChord I bequeath the sum of $300.

"Item 16th. To Rev. J. C. O'Connell I bequeath the sum of $100, in trust for Emma Bean, which sum he will expend for her benefit as he may deem proper.

"Paragraph Third.

"Item 1st. To my daughter Amelia Baldwin I bequeath the sum of $1,000.

"Item 2d. To my grandson Lee Baldwin I bequeath the sum of $15,000.

"Item 3d. To my grandson Barber Baldwin I bequeath the sum of $4,000.

"Item 4th. To my granddaughter Mary C. Cardwell I bequeath the sum of $2,000.

"Item 5th. To my granddaughter Nannie Baldwin I bequeath the sum of $1,000.

"Item 6th. To my granddaughter Sallie Baldwin I bequeath the sum of $1,000.

"Item 7th. To my granddaughter Louise Baldwin I bequeath the sum of $1,000.

"Item 8th. To my grandson Guy Baldwin I bequeath the sum of $1,000.

"Should any of the legatees named in paragraphs two or three of this will die before my death, or decline to accept the bequest, then nothing shall pass or be taken under the item making the bequest by the representative of the legatee who shall die as herein contemplated, or the one declining to accept the bequest; but such legacy or legacies shall become the property of, and are hereby bequeathed to my residuary legatees as named in the fourth paragraph of this will.

"Paragraph Fourth.

"Item 1st. To my son John R. Barber I bequeath the sum of $9,000.

"Item 2d. To my grandson Kent Barber I bequeath the sum of $15,000.

"Item 3d. To my grandson Philetus S. Barber I bequeath the sum of $6,000.

"Item 4th. To my grandson Yancy Barber I bequeath the sum of $7,000.

"Item 5th. To my grandson John Lilly Barber I bequeath the sum of $7,000.

"Item 6th. To each of the children of my son, John R. Barber, the issue of his second marriage, I bequeath the sum of $2,000.

"Item 7th. To each of the children of my grandson, Philetus S. Barber and Yancy Barber, I bequeath the sum of $2,000.

"Paragraph Fifth.

"Item 1st. To my great-granddaughter, Piety Barber, daughter of my grandson Philetus S. Barber, I bequeath my piano and marble top center table.

"Item 2d. To my brother Thomas Smith I bequeath my surrey.

"Item 3d. To my son John R. Barber I bequeath all the furniture in the room which I occupy.

"Item 4th. To my grandson, John Lilly Barber, I bequeath all the furniture in my little room, my hat rack and two oil paintings in the hall.

"Item 5th. To my grandson Lee Baldwin I bequeath the portraits of Mr. Barber and myself.

"Item 6th. To my grandson Kent Barber I bequeath the large picture hanging over the mantle.

"Item 7th. To P. S. Barber, colored, I devise the house and lot near the northwest corner of Bardstown, the same being the property conveyed to my husband, Philetus S. Barber, by the Commissioner of the Nelson circuit court by deed dated February 15th, 1893, and is recorded in the office of the clerk of the Nelson County Court in deed book No. 56, page 279.

"Item 8th. To my great-grandchildren, Alex. Lyman and Ollie Barber, children of my son, John R. Barber, I bequeath my horse called 'Dock' for them to drive in going to school.

"Paragraph Sixth.

"Item 1st. It is my will that the bequests made in paragraphs one, three and four of this will be paid in full and if the proceeds of my estate be not suf-

ficient to pay the bequests as made in paragraph second in full, the legatees are to share pro rata according to the amounts of said bequests as therein set out.

"Item 2d. If there should be any of the proceeds of my estate remaining after paying the bequests as set out in paragraphs first, second, third and fourth of this will, I bequeath such remainder to my legatees as named in paragraph fourth of this will, and the same shall be prorated between them in proportion to the amounts of the bequests as made to them by the fourth paragraph of this will.

"Item 3d. It is my purpose to satisfy in whole or in part some of the bequests made, by paying to some of the legatees all or a portion of the bequests as herein made. If I do so I will make such payments by check through bank, and will advise my executor in writing of the amounts so paid with such intention, who will preserve such writings as evidence of my intention; but such payments shall not change the distribution of the residuary portion of my estate as contemplated in the second item of this paragraph.

"Item 4th. It is my will that all of the estate, real and personal, which I may own at the time of my death be sold by the executor of this will as hereinafter named at such time, on such terms, and in such manner, that is, at public or private sale, as he may deem for the best interest of my estate and devisees; and said executor is hereby empowered to execute deed of conveyance to the purchasers for real estate sold, with such covenants of warranty as he may deem he is authorized to make from the titles held by me.

"Item 5th. I appoint as executor of this will my friend, Wm. C. McChord, of Springfield, Kentucky.

"In testimony whereof I have subscribed my name to the foregoing instrument, containing with this eight (8) pages (written on the first half of each page), as my will, and for the purpose of identifying each page hereof I have written my name on the margin of each page.

"This January the 21st, 1897.

"CECILIA BARBER."

"B, No. 2.

"I, Cecilia Barber of Bardstown, Nelson county, Kentucky, do make this codicil to my will heretofore made by me dated January 21st, 1897, as follows:

"First. I hereby revoke the bequest of $3,000 to St. Joseph's Catholic Church as provided for in item two of paragraph First of my will.

"Second. I revoke the bequest of $700 as provided by Item Ninth of Paragraph First of my said will.

"Third. I revoke the bequest of $333.33 each to Mrs. Sallie Viglina, Edith and Pauline Viglina and the bequest of $300 to Peara Viglina, as provided in Items eleven, twelve thirteen and fourteen of second paragraph of my said will.

"Fourth. I revoke item seventh of the Fourth Paragraph of my said will, by which I make bequeath to certain of my grand-children, that my purpose may be more comprehensive: and I now divide to each of the children of my grandsons, Philetus S. Barber, T. Yancy Barber and John Lilly Barber; and any children that may be born unto them or either of them before my death the sum of $2,000.

"Fifth. To my little friend Margaret Wickliffe, daughter of John D. Wickliffe, I bequeath the sum of $300.

"Sixth. To Polly Homs and her two children, Nancy and Tom, I bequeath the frame house, yard and garden—the Shepherdsville . Pike containing about an acre, now occupied by Ben Bard, colored, provided said Polly continues to live with me as my servant until my death.

"Seventh. I revoke item seventh of Paragraph Fifth of my said will, by which bequest of house and lot, garden, yard containing about one acre made to P. S. Barber, colored, and I now bequeath said house and lot to Nancy Barber, colored, for life with remainder to said P. S. Barber, colored.

"Eighth. In addition to the bequest of $200 bequeathed to George Lancaster by item eighth of Second Paragraph of my will, I bequeath said George Lancaster $300. This codicil is written and subscribed by me in my own handwriting.

"In testimony whereof I have hereto subscribed my name this 17th of April, 1900.

"CECILIA BARBER."

"C, No. 3.

"I, Cecilia Barber of Bardstown, Kentucky, do make and publish this codicil to my will of date January 21st, 1897.

"Item First. I revoke item third of the Fourth Paragraph of my said will by which I bequeath to my grandson Philetus S. Barber $6,000 and now bequeath said $6,000 to his wife, Lena Barber, and hereby constitute her one of my residuary devisees as contemplated and provided by item two of Paragraph Sixth of my said will instead of her said husband, and it is my will that said Lena Barber shall take and have the residuary portion of my estate as contemplated and provided by said item two of Paragraph Sixth of said will as modified by the second item of this codicil as her husband would

have taken but for this codicil. It being my will that said Philetus shall not take anything under my will, and therefore all bequests to him as made by said will are hereby revoked. It being my will to give to said Lena Barber that portion of my estate intended for her said husband. The said Lena Barber to account for and be charged with any advancements that I have made or may hereafter make to her said husband as contemplated by item three of Paragraph Sixth of my said will.

"Item Second. By the second item of Paragraph Fourth of my said will I devise to my grand-son Kent Barber fifteen thousand dollars, and by item two of Paragraph Sixth thereof he is made one of my residuary devisees as provided by said item of said paragraph. It is my will that my grandson Kent Barber shall not take or share in any part of the distribution of any of the residuary portion of my estate as contemplated and provided in said item two of Paragraph Sixth of my said will, but said residue, if any, shall be taken and distributed among the other devisees as named in the Fourth Paragraph of my said will, except that Lena Barber shall have and take that portion thereof which said Philetus would have taken but for this codicil.

"In witness whereof witness my signature this September 19th, 1901.

"CECILIA BARBER."

"D, No. 4.

"I, Cecilia Barber, do make and execute this codicil to my will: to my friend and relative Mrs. Sallie, Bertle, I devise the sum of $500, as a testimonial of my appreciation of the many kindnesses shown to me by her. This codicil is written by me this day, May 8th, 1902.

"CECILIA BARBER."

722        KENTUCKY REPORTS.    [Vol. 138.

Barber's Ex'r v. Baldwin, et al.—Barber, et al. v. Newman, et al.

"E, No. 5.

"I, Cecilia Barber of Bardstown, Nelson County, Kentucky, make this codicil to my will:

"I will and devise to my grand-son Kent Barber my two story frame residence which I now occupy and lot on which it is situated on Main or Third Street in Bardstown, Ky., between the Railroad and the lot on which is situated the two-story brick dwelling known as the Whelan House or property. For the above bequest my grand-son Kent Barber is to be charged $2,000, which amount is to be deducted from the bequest as made to him by my original will, that is to say, instead of receiving $15,000 as named in my said will, he is to receive $13,000. This codicil is written and signed by me in my own hand-writing.

"CECILIA BARBER."

"February 2, 1903."

"F, No. 6.

"I, Cecilia Barber of Nelson County, Kentucky, do make this codicil to my will:

"First. To my great grand-daughter Catherine Cecilia Barber, daughter of my grandson Kent C. Barber, and to any children which may be born to him before my death I bequeath to each the sum of $2,000.

"Second. To my nephews Harry and Richard Smith I bequeath the sum of $500 each.

"In testimony whereof witness my signature this the 7th day of May, 1904.

"CECILIA BARBER."

"G, No. 7.

"I, Cecilia Barber, make and execute this codicil to my will:

"I appoint my grand-son John L. Barber as joint

executor of my will to act in conjunction with W. C. McChord who was nominated as my executor by my original will.  The said John L. Barber and W. C. McChord to constitute  the executors. of  my said wills.   *  *  *

"This March 6th, 1906.

"CECILIA BARBER."

All of the devisees  under  said will were made parties to the appeal from the order probating same, as were the executors named in the will.  The charges of want of capacity and undue influence were denied, and upon the issues thus formed the case was tried out before a jury, with the result that the will was sustained in  every  particular  except as to  two clauses, in which disposition was made of the residuary estate.  These two clauses the jury held were not the will of the testatrix.  Upon the finding and verdict of the jury judgment was entered, and, a motion and ground for new trial having been overruled, the propounders prayed and were granted an appeal and given time to prepare and tender their bill of evidence and exceptions.  Shortly thereafter, and before the appeal was perfected in this court, the propounders instituted an  equitable action in the Nelson circuit court, wherein they set up the paper which the jury had declared to be the true last will and testament of Cecilia Barber as her last will, and asked that same be construed and the executors given directions as to how its  various provisions should be executed and carried into effect.  To this suit the heirs of Mrs. Baldwin, who were the appellants in the will contest, were made parties defendant.  They pleaded in bar the pendency of the appeal from the judgment in the will contest case.  The trial court held that the matter set out in this answer

did not constitute an estoppel. This ruling was correct. The prosecution of the equity suit might be construed to operate as an abandonment of the position taken by the propounders in the will contest proper; but such question could only be raised in that suit, as, in fact, it later was. When the plea in bar was overruled, the defendants joined issue with the plaintiffs upon the question as to whether or not the will set up in the petition disposed of her entire estate. This was the real question presented for determination in the equity suit. The case was prepared and submitted to the chancellor for judgment, and upon consideration he held that all of the estate which was not made the subject of special bequest was undisposed of and passed by the law of descent to the heirs at law of the testatrix. From this finding and judgment the plaintiffs have prosecuted an appeal.

The two cases were argued, and will be consider- and disposed of together. If the construction of the will contended for by the plaintiffs in the equity suit is correct, and the will, with the portions thereof which the jury held not to be a part of the true last will and testament of the testatrix eliminated, when properly construed, disposes of the residuary estate practically as it would have if those portions had not been stricken out by the jury, then, of course, it becomes unnecessary to consider at length the questions raised upon the appeal of the will contest proper. We will, therefore, consider the equity suit first.

The portions of the will which were rejected by the jury were the concluding clause of paragraph 3 of the original will, which is as follows: "Should any of the legatees, named in paragraphs two or

three of this will, die before my death, or decline to accept the bequest, then nothing shall pass or be taken under the item making the bequest by the representative of the legatee who shall die as herein contemplated, or the one declining to accept the bequest; but such legacy or legacies shall become the property of, and are hereby bequeathed to my residuary legatees as named in the fourth paragraph of this will." And item 2 of paragraph 6 of the will which is as follows: "If there should be any of the proceeds of my estate remaining after paying the bequests as set out in paragraph first, second, third, and fourth of this will, I bequeath such remainder to my legatees as named in paragraph fourth of this will, and the same shall be prorated between them in proportion to the amounts of the bequests as made to them by the fourth paragraph of this will." In paragraph 2 of the original will the testatrix made bequests to various relatives and friends and in paragraph 3 she made bequests to her daughter and her daughter's children. The plain purpose and intent of testatrix, as expressed in the latter clause of paragraph three of the will, was to give to her son, John Barber, and his children and grandchildren, that portion of her estate which she had willed to any of her relatives or friends, or to her daughter or her daughter's family, in the event that any of them died before she did. The purpose of this provision was to place all of her estate disposed of under paragraphs 2 and 3 in the residuary estate, unless the persons to whom the bequests therein made should be living at the date of testatrix's death. With this clause eliminated from the will, all bequests made to friends and relatives or her daughter's family which failed be-

cause of the death of such legatees prior to that of testatrix were undisposed of by the will. By item 2 of paragraph 6 the residuary estate was directed to be divided ratably among the devisees named in paragraph 4, to wit, John R. Barber, Kent Barber, Philetus S. Barber, Yancy Barber, John Lilly Barber, the children of John R. Barber by his second marriage, the children of Philetus S. Barber, and the children of Yancy Barber. With this clause eliminated, the residuary estate is left undisposed of. But it is the contention of appellants that, even with these clauses which were rejected by the jury eliminated, the testatrix, by codicil "C, No. 3," has disposed of her residuary estate, and that by the terms of said codicil "C, No. 3," the same parties, or practically the same parties, who were residuary legatees under the original will, are made legatees of the residuary estate. Upon this construction of codicil "C, No. 3," their entire contention must rest, for there is no other clause in either the original will or any codicil thereto in which any reference is made to the residuary estate.

It is elementary that each portion or paragraph of a will must be read in connection with the remaining parts thereof, and the intention of the testator gathered from a consideration of the whole. In order, therefore, to arrive at the intention of the testatrix by the draft of codicil "C, No. 3," it becomes necessary to look at the will, not as found by the jury, but as regarded by the testatrix herself at the time of the execution of codicil "C, No. 3." By the plain terms and provisions of her original will, she had given to her son Philetus S. Barber $6,000, and provided that he should be one of her residuary legatees. Item 1 of codicil "C, No. 3," revokes the

original will entirely as to Philetus S. Barber. The bequest which had been made to him therein is taken from him and given to his wife Lena Barber, and she is substituted for him as one of the residuary legatees. In the original will Kent Barber is named as one of the residuary legatees, and by item 2 of codicil "C, No. 3," this provision of the original will as to Kent is revoked, and it is expressly declared that he shall take no portion of the residuary estate. The testatrix by this codicil was not attempting to dispose of her residuary estate, but merely to make certain changes in regard to the disposition already made thereof, and, when the name of Lena Barber is substituted for that of her husband, Philetus, in item 3 of paragraph 4 and in item 2 of paragraph 6, and the name of Kent Barber as a residuary legatee is stricken from item 2 of paragraph 6, the whole purpose, aim, and intent of the testatrix in the execution of codicil "C, No. 3," is satisfied. At the time of the will contest, when the jury was considering and passing upon the question as to whether or not the paper offered in evidence as the will of testatrix was in fact her will, they had before them the orginal will and codicil "C, No. 3," along with the other codicils. They read them together, and, reading them together, first read codicil "C, No. 3," into the original will, as above indicated, and, when so read, the jury held that the portions of the paper herein indicated were not the will of testatrix, and they therefore rejected such portions, upon the evident idea that the testatrix in the execution thereof had been unduly influenced. There can be no doubt that testatrix by codicil "C, No. 3," did not attempt to dispose of the residuary estate, but executed it solely for the purpose of changing the names of some

of those who should participate in its distribution.
To hold otherwise would be to nullify the verdict
and to enforce the provisions of the original will in
spite of the finding of the jury against them.    This
was the view taken by the chancellor in the   lower
court.

It is most earnestly insisted by appellants that the
following language in item 2 of codicil ''C, No. 3,''
supports their contention, to wit: ''But said residue,
if any, shall be taken and distributed among the other
devisees as named in the fourth paragraph of my
said will, except that Lena Barber shall have and
take that portion thereof which said Philetus would
have taken but for this codicil.'' Considered discon-
nectedly and by itself, this   language would seem to
bear such construction.  But it will be observed that
the phrase seized upon is but the concluding portion
of a sentence, and, in order to properly construe this
language, it must be read in connection with the
preceding portion of the sentence, and, when so con-
sidered, it is plain that the testatrix was   merely
aiming to revoke so much of item 2 of paragraph 6
as made Kent Barber one of her residuary legatees,
and to substitute the name of Lena Barber for that
of her husband, Philetus S. Barber.   Codicil ''C, No,
3,'' can in no sense be considered as revoking item 2
of paragraph 6 of the will. On the contrary, in both
items 1 and 2 of said codicil ''C, No. 3,'' it is made
clear that the testatrix regarded item 2 of paragraph
6 as being in full force and effect and as controlling
the disposition of her residuary estate.  And in item
2 of said codicil ''C, No. 3,'' it is expressly stated that
she does not desire her grandson. Kent Barber to
take any part of the distribution of the residuum of
her estate, as contemplated and provided in item 2

of paragraph 6, but said residue shall be taken by the other devisees named in the fourth paragraph of her will, save and except that Lena Barber is substituted for her husband as a devisee therein. The language is plain, unambiguous, and certain, and, when this codicil is read in connection with the will itself, it is susceptible of but one interpretation; and that is that the testatrix desired that the residuary estate should pass to the devisees named in item 4 of the original will, modified to the extent that Lena Barber take her husband's place and Kent Barber be denied the right to participate therein. It is item 2 of paragraph 6 of the will that disposes of the residuary estate, and, the jury having determined by its verdict that this item of paragraph 6 was not a part of the will of the testatrix, no disposition whatever was made of the residue of her estate that remained after satisfying the special bequests, The chancellor having so held, the judgment in the equity suit must be affirmed.

This leaves for our consideration the correctness of the judgment in the will contest proper. At the outset, it is urged that the prosecution by the propounders of the equity case wherein a construction of the will is sought operates as a bar against the further prosecution of the appeal in the will contest proper. We have carefully considered the record in this case, and from the conclusions which we have reached upon the merits of the case, it becomes unnecessary to pass upon this question. At the date of the execution of the will in question, the testatrix, as stated, was seventy-eight years old. With little or no business experience during her life, she was suddenly left with a considerable fortune on her hands. Her son, John R. Barber, practically selected

730 KENTUCKY REPORTS. [Vol. 138.

Barber's Ex'r v. Baldwin, et al.—Barber, et al. v. Newman, et al.

for her an attorney, who, in connection with members of his family, advised her and managed and controll-ol her estate until her death. The record shows that P. S. Barber was a good business man, that long prior to his death he had assisted his daughter and her husband in business when they lived in Louisville, and later, when they moved to Bardstown, had again assisted them; and in these business enterprises he had perhaps, taking the testimony most strongly against the contestants, advanced to his daughter sums amounting to $20,000 or more. It likewise appears from the evidence that he had assisted his son in the purchase of a very valuable farm in Washington county, and had otherwise aided and assisted him, so that it may fairly be presumed upon a consideration of all of the evidence, that he had been as generous and as liberal in his dealings with his son as he had with his daughter. He had stated, prior to his death, that the law made the best will, and certain it is that he did not regard that either of his children had been given any advantage over the other. He made no charge against either for advancements. Following close upon his death, his wife and son and daughter entered into the agreement above set out, whereby the entire estate was divided among them equally, or as nearly so as they were able to divide it, fixing reasonable value upon each of the properties. No suggestion of advantages previously had as between the children was made at that time so far as the record shows. Very soon after Mrs. Cecilia Barber entered into business relations with the attorney for her son, she conceived the idea that her daughter had been favored by her father during his lifetime to the extent of approximately $20,000, and she felt it her duty to

equalize them in her will to this extent at least. There is not the slightest intimation in the entire record that her lawyer was instrumental in any wise in creating or fostering such an idea on her part. How she became possessed of it is not shown, but certain it is that she entertained it, and a few months after the partition of the estate between herself and her children she caused a will to be drawn, wherein she gave the great bulk of her estate to her son and his family, not only equalizing them according to the ideas expressed by her to her counsel, but providing most bountifully, after doing so, for her son, who is shown to be a man in splendid financial circumstances, to the prejudice of her daughter and her family, who were not nearly so well off. To this first will there were drawn at least two codicils, and desiring still further changes made, after consulting her lawyer, it was deemed advisable by her that the original draft and the codicils be destroyed and the entire will rewritten. This desire was carried out by her lawyer, and the will in contest drawn. Under this will and its several codicils, her daughter and her family received something like $11,000, whereas her son and his family received about $120,000; so that, if her purpose had been alone to equalize her son with her daughter, by accounting to him for some $20,000 which she seems to have thought her daughter received in excess of her son during the lifetime of her husband, the son and his family should have received $20,000 and the remaining $110,000 should have been divided equally between them; whereas, the daughter and her family received but $11,000, while the son and his family received over $100,000. In other words, in her efforts to right a wrong, she herself was perpetrating one upon her daughter and

her family monetarily four times as great. This great inequity is not satisfactorily, or at all, accounted for by the expressed desire upon the part of the testatrix to equalize her children. It is shown that from the death of her husband until her death she lived, and was thrown with, her son's family in the main, and there is evidence tending to show that after the date of the execution of this will it was with difficulty that her daughter's family could see her alone. Some one of the members of her son's family or persons who lived with them were ever present during conversations between the testatrix and her daughter's family. That her son and his family were exercising a controlling influence over her movements and preventing her from freely associating and communicating with her daughter's family would be most difficult to prove, and such a conclusion is not wholly warranted by the record, but there is some evidence tending to establish this fact. It is related that on one occasion, when her daughter was sick in Louisville, and John E. Newman, who had married one of her daughter's children, made known to her that his wife was going to Louisville the next day to see her mother, testatrix expressed a desire to accompany her, and it was agreed that she should do so. They were to meet at the railroad station the next morning, but testatrix failed to come and did not go to Louisville. Later in the day, when Newman met her and inquired why she had not gone, she responded that they would not let her. It is not shown who was meant by "they," but, as she was then living with her son's people, it is fair to presume that "they" meant some of her son's family. Two of her granddaughters, children of her daughter, testify that the close attention which their grandmother re-

ceived from members of their uncle's family when they visited her or she called at their home was marked and attracted their attention. It is testified that she would say to her daughter's children in making them little presents that she did not want members of the family where she lived—her son's people —to know of it. As straws indicate the direction in which the wind blows, so it is that undue and improper influence, exercised over one upon whom the weight of years has begun to bear heavily may be pointed out. Why might testatrix not be permitted to visit her sick daughter? What was the reason she was not permitted to go? Might it have been because of the fear on the part of some one that it was not safe to leave her unaccompanied in the presence or society of her daughter? Why was it that such a watchful care was exercised over her movements when her daughter's family visited her or she paid short calls at their home? Why was it that she was unwilling for her son's family to know that she made slight presents to her daughter's children? No satisfactory answer is furnished by the great mass of evidence which has been taken in this case. It is true that all of the appellants who have testified have denied exercising any improper influence over testatrix, or attempting to do so, or in any wise attempting to control or direct her as to when she should go, and where, and how, and with whom, or that there was any effort on their part to prejudice testatrix against her daughter and her family. Still it can not be said that, if the testimony of appellees upon these questions is true, it would not show some evidence of undue influence, and, when the age of testatrix is considered, such conduct on the part of appellants would afford some explanation for the great

inequality of her will. These acts and circumstances being some evidence, slight it may be conceded they are, it was the duty of the trial court, under the oft announced rule of this court, to submit the question to the jury for their determination under proper instructions. Walls v. Walls, 99 S. W. 969, 30 Ky. Law Rep. 948; Livering's Ex'or v. Russell, 100 S. W. 840; Hudson v. Adams' Adm'r, 49 S. W. 1)2, 2 Ky. Law Rep. 1267.

Much complaint is made of the rulings of the trial judge in the admission and exclusion of evidence, but, considering the fact that in will contests the evidence is always permitted to take a wide range, necessarily covering much of the life history of the one whose will is being contested, and going largely into the relations existing between the parties dealing with the testator, we are of opinion that these objections are not well taken.

The jury could not have failed to understand the question which they were called upon to determine. It was a comparatively simple one, and the instructions which the court gave for their guidance are such as have frequently been approved in contests of this character, where undue influence and want of capacity are the grounds relied upon to defeat the will.

There are many other circumstances brought out in the evidence which we have not deemed it necessary to consider in detail. Having reached the conclusion that there was evidence authorizing the submission of the case to the jury, and being satisfied that the conclusion reached by the jury was both just and righteous, the judgment is affirmed.