## Lisle, et al. v. Couchman, et al.

(Decided January 23, 1912.)

### Appeal from Clark Circuit Court.

1. **Wills—Contest—Trial—Pleading—Motion to Require Statement of Grounds of Contest—What Necessary to Perfect Appeal.—A**

motion to require the contestants to file in writing a statement of the grounds relied upon to have the will set aside, was properly overruled by the trial court. The filing of a transcript of the proceedings in the county court with the clerk of the circuit court and having summons issued, is all that is required to perfect the appeal from the judgment of the county court.

2. Same—Evidence—Individual Circumstances—Undue Influence.—In an action to set aside a will upon the ground of undue influence, a conversation between one of the propounders, who was at the time of the conversation guardian for one of the contestants, in which he told her if she did not mind him she would regret it, and when she asked him why, said, "on your grandfather's account," was competent, although it occurred thirteen years before, it being a circumstance, and usually such contests rest upon individual circumstances.

3. Same—Peremptory Instruction.—The trial court properly refused to give a peremptory instruction to find for the propounders, the evidence showing as it did a want of testamentary capacity and the exercise of undue influence

4. Same—Province of Jury.—It was the province of the jury to say, under all the evidence, whether or not the paper in question was the last will and testament of the deceased, and their finding, under proper instructions, must be approved.

PENDLETON, BUSH & BUSH and HAZELRIGG & HAZELRIGG for appellees.

ROBT. HARDING, J. F. WINN and J. M. STEPHENSON for appellants.

OPINION OF THE COURT BY JUDGE LASSING—Affirming.

Claiborne Lisle died a resident of Clark County on the 18th of January, 1910. He left surviving him five children, Minerva Hodgkin, Thomas Lisle, D. C. Lisle, Zipporah Oliver and J. D. Lisle. Three of his children, to-wit, Marcus Lisle, Lou Ann Eubank and Nancy Duckworth, had theretofore died leaving children. Marcus left one son, E. C. Lisle. Lou Ann Eubank left five children, Rosa Tracy, Minerva Eads, Kate Hisle, Walter Eubank and Charles Eubank. And Nancy Duckworth left surviving her four children, Esther L. Couchman, Ben K. Duckworth, Ernest Duckworth and John Duckworth. John died, leaving no children.

Following the death of Claiborne Lisle there was filed in the Clark County Court certain papers, purporting to be his last will and testament. These papers were admitted to probate as such. Thereafter the three children of Nancy Duckworth, to wit, Ben K. Duckworth,

Ernest Duckworth and Esther L. Duckworth, who had intermarried with one Frank L. Couchman, and E. C. Lisle, only child and heir at law of Marcus Lisle, appealed from the judgment of the Clark County Court admitting said papers to probate, and in the Circuit Court sought to have said papers declared not the true last will and testament of Claiborne Lisle, upon the ground of lack of capacity upon the part of testator to make a will and undue influence exercised over him in making it. The case was tried out before a jury, with the result that the said papers were declared to be not the true last will and testament of Claiborne Lisle. From the judgment predicated upon the verdict certain of the heirs and devisees have prosecuted this appeal, and seek a reversal upon several grounds, which will be noted in the inverse order of their importance.

The subject matter of this litigation is two papers executed by Claiborne Lisle on the 20th of December, 1909, as follows:

"I, Claiborne Lisle, of Clark County, Kentucky, being of sound mind and disposing memory, do make and publish this my last will and testament.

"ITEM FIRST. I desire to be buried decently and without ostentation.

"ITEM SECOND. I desire all my just debts paid.

"ITEM THIRD. I have by deed conveyed all of my real estate to those of my children whom I wish to have it, saving and excepting my lot in the Winchester Cemetery, which I leave to all of my children and their descendents jointly, with the right to be buried therein, should any of them so desire.

"ITEM FOURTH. I desire a suitable stone to be placed at my grave, and that there shall be inscribed upon it the following epitaph: 'What conscience dictates to be done, or warns me not to do, is more than Hell to shun or Heaven pursue.'

"ITEM FIFTH. I give to each of the living children of my son, James D. Lisle, excepting his son, Jesse, the sum of one thousand dollars, and to said Jesse Lisle I give the sum of five hundred dollars. I make this bequest to my grandchildren instead of my son, because he has a mania for speculation and would squander it.

"ITEM SIXTH. I give to each of the five children of my deceased daughter, Lou Ann Eubank, the sum of five hundred dollars.

"ITEM SEVENTH. I give to each of the three living

children of my deceased daughter, Nancy C. Duckworth, the sum of five hundred dollars.

"ITEM EIGHTH. I give to my grandson, E. C. Lisle, the sum of one dollar. I do this for the reason that I have advanced to his father, Marcus C. Lisle, more than has been received by any of my children, and far more than his full share of my estate, and for the further reason that he now has all the money he can expend judiciously.

"ITEM NINTH. I give to my daughter, Minerva Hodgkin, my ten shares of stock in the Winchester Building & Loan Association, and direct that all dues thereon shall be paid out of my estate by my executors until said stock is fully matured, the same to be paid over to her and to be hers absolutely. This special bequest is made in recognition of her constant care and attention to me in my illness.

"ITEM TENTH. I give to my daughter, Zipporah Oliver, twelve shares of stock in the Winchester Bank of Winchester, Kentucky, for and during her natural life, she to have all the dividends declared and profits thereon that may be divided during her life, and at her death said stock with all undivided profits to go to her son, Charles Oliver, and his heirs at law.

"ITEM ELEVENTH. I give to my son, Thomas Lisle, twenty-one shares of stock in the Winchester Bank of Winchester, Kentucky, the same to be liable for contribution, as hereinafter provided.

"ITEM TWELFTH. I give to my daughter, Minerva Hodgkin, twenty-one shares of stock in the Winchester Bank of Winchester, Kentucky, subject to contribution as hereinafter provided.

"ITEM THIRTEENTH. I give to the five children of my son, D. C. Lisle, twenty-one shares of stock in Winchester Bank of Winchester, Kentucky, subject to contribution as hereinafter provided.

"ITEM FOURTEENTH. I own fourteen shares of stock in the White City Bank, Kansas, and two and one-half shares of stock in the Louisville National Banking Company. This, I desire, shall be sold by my executors, either publicly or privately, as they may deem best, to provide for the payment of the cash legacies given by the preceding items of this will, and after payment of the cash legacies from the sale of said bank stock and the proceeds derived from my notes and choses in action, the said residue shall be divided into three equal shares, and

I give one share thereof to my son, Thomas Lisle, another to my daughter, Minerva Hodgkin, and the other equal share to the living children of my son, D. C. Lisle, provided, however, that if my estate be insufficient to pay off the legacies given to my other children, the bank stock given in the last three preceding items to my said son, Thomas Lisle, and my daughter, Minerva Hodgkin, and D. C. Lisle's children shall be charged with a sum sufficient to make up said deficiency to be paid back by them to my estate, in equal proportion.

"ITEM FIFTEENTH. I appoint my son, Thomas Lisle, and my grandson, H. Clay Hodgkin, executors of this my last will and testament, and request them to strictly carry out all of its provisions. And I hereby request the Clark County Court that no surety be required of them on their bonds as such executors.

"In testimony whereof, I have hereunto subscribed my name this 20th day of December, 1909.

"CLAIBORNE LISLE.

"Subscribed by Claiborne Lisle in our presence, and by each of us at his request and in the presence of each other, this 20th day of December, 1909.

"D. A. THOMSON,
"J. B. EUBANK."

"I make this codicil to my foregoing will, dated December 20, 1909.

"ITEM SIXTEENTH. If any legatee or legatees named in my said will shall seek to set it aside, directly or indirectly, by resisting the probate thereof or by appeal from the order of court admitting same to probate, or shall in any wise encourage, aid, assist or countenance such proceeding on the part of another, then the portion given to such legatee or legatees so offending shall pass under item fourteen of my will to the persons named therein as residuary legatees.

"CLAIBORNE LISLE.

"Subscribed by Claiborne Lisle in our presence, and by each of us at his request in his presence and in the presence of each other.

"This 20th day of December, 1909.

"D. A. THOMSON,
"J. B. EUBANK."

At the date of their execution the testator lacked but a few months of being ninety years old. He had been sick since the latter part of October, preceding; confined to his bed with pneumonia from the 15th day of Novem-

ber before the execution of these papers, and was, at the date of their execution, not only enfeebled by the weight of years, but by the ravages of disease with which he had been and was then suffering. It appears in proof that he had been a thrifty, active energetic man, who, by the practice of rigid economy through a long life had accumulated a comfortable estate, amounting to more than thirteen hundred acres of land and $42,000 in cash and personal property. He lost his wife about thirty-three years before his death. He lived with his daughter, Minerva Hodgkin, through the latter years of his life and died at her house. After he was eighty years of age he conveyed all of his land to Mrs. Oliver, Mrs. Hodgkins and her sons, Sam and Clay, Thomas Lisle and the wife and children of D. C. Lisle. There is some proof in the record that prior to that he had assisted his son, D. C. Lisle, to the extent of some $15,000 or more, and had also aided his son, Marcus Lisle, in his lifetime. There is no evidence that he had assisted in any way the children of either Mrs. Duckworth or Mrs. Eubank. The exact value of these lands so conveyed to his children and grandchildren above named is not given, but as they all lay in Bourbon and Clark Counties, it is evident that they far exceed in value the personal estate left at his death.

When this will was written his oldest son, J. D. Lisle, was confined in an asylum, a hopeless lunatic and a helpless paralytic. He did not long survive his father. His children and the children of Mrs. Eubank refused to join in the prosecution of this appeal. It is shown in the record that E. C. Lisle, son of Marcus, inherited from his mother a considerable estate; that the children of Mrs. Eubank are poor, as are the children of Mrs. Duckworth. What little property they inherited from their fathers was, in the main, expended during their minority in an effort to acquire an education. Mrs. J. D. Lisle owns a good farm of some two hundred acres or more. It is not shown what property Minerva Hodgkins, Zipporah Oliver, Thomas Lisle, or D. C. Lisle owned, other than that which they acquired from their father.

When the case was called for trial the propounders moved the court to require the contestants to file in writing a statement of the grounds upon which they relied to have the will set aside. The court overruled this motion, and of that ruling the appellants now complain.

Proceedings upon appeal from an order of a county court, probating or rejecting a will, are controlled wholly

by statute, as was expressly decided in Arterburn v. Young, 14 Bush, 509. And in Pryor v. Mizner, 79 Ky., 232, it was held that the filing of a transcript of the proceedings in the county court with the clerk of the circuit court and having summons issued is all that is required to perfect the appeal. And again, in Williams v. Williams, 90 Ky., 28, it is held that technical strictness is not required in appealing from an order of the county court probating or rejecting a will, and that it is sufficient if the transcript filed shows who the parties appellant and appellee are, and that the judgment of the county court was rendered at a certain time, from which appellants desire to appeal. The proceedings in the case at bar conform strictly to the requirements of the statute, as determined by the decisions of this court above referred to.

It is next urged that the court erred in admitting certain incompetent evidence. The first of such evidence complained of is a conversation alleged to have taken place between Mrs. Couchman, one of the contestants, and Thomas Lisle, one of the propounders. This conversation took place some thirteen years before the date of the execution of the paper offered as a will. At that time he was her guardian and, according to her testimony, objected to her visiting her friends around the neighborhood. Some difference arose between them on account of this objection, and she alleges that, in a conversation growing out of this desire on her part to visit her friends and relatives more than he was willing to have her do, he said to her, "If you don't mind me and do what I tell you you will regret it some day." And I asked him why, and he said, "On your grandfather's account, that is why."

Throughout the trial an effort was directed on the part of contestants to show that the testator had been prejudiced against them by some one for the purpose of preventing them from sharing in his estate. It was shown that Thomas Lisle did not entertain a kindly feeling toward Mrs. Couchman, and this threat of his, communicated to her, it is true, some thirteen years or more before the draft of the will, was offered in connection with other evidence for the purpose of showing that he had succeeded in doing what he threatened her to do, to-wit, induce his father to practically disinherit her. As has been frequently held in litigation of this characacter, a broad latitude is allowed in the introduction of

evidence tending to establish the exercise of an undue influence over the testator. If it was competent for the propounders to show, as a reason why the testator practically excluded Mrs. Couchman and others of his grandchildren from participating in the distribution of his estate, that he was displeased with her mother's marriage, which had occurred some twenty-nine or thirty years before the draft of this paper, it would certainly be equally competent for the contestants to show that they were excluded from participation in the estate, not on account of any opposition which their grandfather may have had to their mother's marriage, but because of an enmity or ill-will entertained by their uncle against them. The evidence was competent. It is not necessary that evidence of undue influence should relate to the immediate time when the will is being drafted. On the contrary, in the vast majority of cases an undue influence which is shown to have improperly controlled the testator in the disposition of his estate is usually shown to have been exercised over a long period of time, and the causes leading up to and including the exercise of such an influence must necessarily therefore have existed long before the execution of the paper mentioned. When, therefore, Thomas Lisle said to his niece, Mrs. Couchman, that because she would not mind him he would make her regret it some day on her grandfather's account, and it is shown that she declined to take his advice and did not mind him, but left his home, and that thereafter the relation between them was not cordial or friendly, and her grandfather did practically disinherit her, we think that the court correctly held that this alleged conversation should go to the jury for what it was worth. It was a circumstance, and, as is usual, contests rested on the ground of undue influence are built upon individual circumstances, some of which are frequently quite remote from the date of the act complained of; but all of which, when taken together and woven into a composite whole makes it a perfect case.

It is likewise urged that the court erred in permitting Mrs. Couchman to testify to a conversation between herself and her aunt, Mrs. Hodgkins, in which Mrs. Hodgkins is alleged to have told her that her grandfather did not like them, referring to herself and her brothers, because her uncle Tom was always telling him something against them, the exact language being, "I asked her why grandpa did not like us, and she said she thought it

was Tom's fault, that he was always telling things against us, and always had." This, it is insisted, was hearsay testimony, and for that reason incompetent. While Mrs. Hodgkins denied making the exact statement attributed to her, Mrs. Couchman says she did. It was not hearsay testimony. Mrs. Couchman does not say that Mrs. Hodgkins told her that she had heard that her brother Tom had made these statements; but from her testimony, as detailed by Mrs. Hodgkins, it is apparent that Mrs. Hodgkins was present at the time and heard her brother Tom make these statements. A different question would be presented if Mrs. Couchman had stated that Mrs. Hodgkins told her that she had heard that her brother Tom had been talking to their grandfather against them. This evidence was clearly competent for the purpose of exhibiting to the jury another circumstance, or link in the chain, by which the contestants were attempting to show that Thomas Lisle, either for some selfish motive of his own, or to satisfy some spiteful or revengeful spirit, was endeavoring, by prejudicing his father against Mrs. Couchman and her brothers, to prevent him from giving them any of his property.

It is likewise urged that the court erred in permitting Mrs. Couchman to detail in rebuttal a conversation which she had with Clay Hodgkins, in which he told her that, in closing out a business transaction which he and his brother had with her grandfather, her grandfather said to him that he and his brother ought to give him a suit of clothes; that he had no other except the one he had on, and no money to buy one with, and that when he made this statement he broke down and wept. Clay Hodgkins had been asked if he had made this statement. He denied making it in terms, although admitting that a conversation akin to the one set out and detailed by Mrs. Couchman had taken place. This was competent for two reasons. If the transaction occurred as stated by Mrs. Couchman, it evidenced a recognition on the part of Clay Hodgkins that his grandfather's mentality was weakening, for he knew at the time that this statement was alleged to have been made to him that his grandfather was worth at least forty or fifty thousand dollars. It was likewise properly permitted to be introduced as affecting the credibility of the witness, Clay Hodgkins.

The only remaining evidence complained of is that in which the court permitted Mrs. Rosa Tracy to detail a conversation between herself and her grandfather, the

testator, in the presence of Mrs. Hodgkins. This conversation is alleged to have taken place but a short time before the will was executed, when she was paying her grandfather a visit. Just before she left he asked her about a piece of land which she and her husband had been, upon his advice, considering purchasing. According to Mrs. Tracy's version of the incident, as soon as the testator commenced to talk business to her, Mrs. Hodgkins said, "You hush, papy; Tom will talk to Rosa." It is insisted that this evidence is incompetent because not pertinent and tended to explain no issue in the case. Mrs. Hodgkins admits that the conversation took place, though, according to her statement, she merely said to her father, "Well, she's going over to Tom's anyway, brother Tom's ; it is getting late anyway, and Tom will attend to that for you, I am sure."

In determining the relevancy of this evidence, it must be viewed from the standpoint of the contestants. Its purpose was to show that Mrs. Hodgkins would not permit her niece to converse with the testator relative to matters of business, and we think this evidence, coupled with other evidence, tending to show that for some time just prior to the execution of the will none of these grandchildren, who were practically disinherited, were permitted to be alone with their grandfather, but there was always present with them in the room when they visited him either Mrs. Hodgkins or some member of her family, was competent; and, while slight, was nevertheless some evidence tending to illustrate or substantiate the charge that the testator, in the attempted disposition of his property, was dominated, influenced and controlled by those of his children to whom he attempted to give it.

The instructions are criticised as being not applicable to the facts in this case; but they are practically such instructions as this court has many times approved as correct in cases where the grounds of contest relied upon were, as here, lack of capacity and undue influence.

It is urged that counsel for contestants were guilty of misconduct in their argument of the case to the jury. The language complained of can not be criticised. One statement, of which complaint is particularly made, is that counsel said to the jury that the instructions were merely dry bones, and that counsel had the right to put flesh and blood on them, so that the jury might know the whole law of the case; that counsel then said that it would be argued by counsel for propounders that there was no

evidence before the jury of lack of testamentary capacity or undue influence, but that this could not be true, because the court had told the jury that there was evidence of lack of testamentary capacity on the part of Claiborne Lisle, and also evidence of undue influence. Appellants had asked the court to give the jury a peremptory instruction, telling the jury that they should find the paper the true last will and testament of Claiborne Lisle. Such a motion could not have been sustained if there was any evidence of either undue influence or lack of capacity. Hence, in stating to the jury that the court had said that there was some evidence of undue influence and lack of capacity, counsel but stated the truth; for if the court had not been of opinion that there was some evidence, slight though he might have regarded it, it was his duty to take the case from the jury, and his failure so to do warranted counsel in stating as he did that the court was of opinion that there was some evidence presented of both lack of capacity and undue influence.

Nor is the statement that the instructions were "dry bones" subject to the criticism which counsel for appellant would make of it. The instructions are abstract propositions of law, and when the facts of this case were applied to the instructions, the act of applying the facts as developed by the evidence to the law as given by the court might properly be likened unto the clothing of dry bones with flesh. The analogy may not have been altogether apt, but this effort on the part of counsel is not subject to criticism. There was no statement by counsel that the law of the case was other than that given by the court. The effort was merely to take the abstract propositions of law, as given by the court, and the individual facts and circumstances, as detailed by the witnesses, and demonstrate to the jury that from them it could be shown that the papers under consideration were the product either of an unsound mind or of one unduly influenced in their execution, to the prejudice of the contestants.

This leaves for our consideration but two questions, first, did the court err in refusing to peremptorily instruct the jury to find for the propounders; and, second, if he did not err in this, did he err in refusing to set aside the verdict of the jury as being flagrantly against the evidence. From what has already been said in disposing of the objection to the admission of certain evidence, it is apparent that the court correctly refused to give the peremptory instruction.

Upon the other point a more difficult question is presented. The testator is, by the overwhelming weight of the evidence, shown to have been a man of strong mind, though, at the same time, of powerful prejudice. He is likewise shown to have been a very peculiar man, one who, according to the testimony of all the witnesses, rarely spoke to any one concerning any member of his family. He was opposed to the marriage of both his daughters, Mrs. Eubank and Mrs. Duckworth. In all of the testimony, no good reason is assigned for this opposition; in fact, no reason at all is given. And yet, he never spoke to either after their marriage, although they each visited thereafter at his home and remained there a considerable time. It is also shown that he disliked Jesse Hodgkins, the husband of his daughter, with whom he lived, or rather, who lived with him after the death of his wife, for the farm upon which they lived belonged to testator. Because of this dislike he refused to speak to him or have anything to do with him. His wife says that this dislike of her husband was occasioned by her husband's dissipated habits. He did not like him any more than he did the husband of either Mrs. Eubanks or Mrs. Duckworth; and yet, because of this dislike of Jesse Hodgkins he did not disinherit his daughter, Mrs. Hodgkins; but, on the contrary, made ample provision for her, giving to her as much as he did to his son, Thomas, and in addition deeded to her two sons, Sam and Clay, a hundred and fifty-four acres of land. Despite the fact that he refused to speak to his daughters, Mrs. Duckworth and Mrs. Eubanks, after their marriage, it is shown that, after their death, and their little children had been returned to Kentucky, he was fond of all of them. When the Duckworth children were living in Winchester, going to school, he spent much of his time with them, as their guest, and there is not a scintilla of evidence in the entire record that there was ever the slightest difference between testator and any one of the Eubanks children or the Duckworth children, other than John, who died long before testator attempted to make this will; and there is abundant evidence to show that any feeling of ill-will that he may have entertained toward John was produced, not by any act of John's, but through the advice of his son Tom to John's guardian, in which Tom told the guardian to sue his father for John's money, and induced him to do so without even consulting testator or

giving him an opportunity to pay the money without suit.

Nor is any reason assigned in the evidence why E. C., son of Marcus Lisle, should have been disinherited, unless the statement that he had a comfortable estate of his own which he had inherited from his mother, be accepted as sufficient ground. There is evidence in the record showing that some one was evidently attempting to influence and prejudice the testator against him, for it is shown that upon one occasion, when testator met him and accused him of not attending school regularly, he stoutly denied the charge and demanded an investigation. When he had satisfied his grandfather that the statement was not true, his grandfather refused to state the source of his information, on the ground that it would only cause trouble. Again, his grandfather accused him of being extravagant, and told him, in substance, that if he did not cease his extravagant ways he would disinherit him. All of the proof shows that this charge was not well founded, and that he was not in fact extravagant. His son, J. D. Lisle, had for many years been paralyzed, and a short time before the date upon which the will was written had been adjudged insane and sent to, and was at that time confined in, a lunatic asylum. This last step had been taken on his father's, the testator's, initiative, and yet the will recites that nothing is given to his son, James D., because he has a mania for speculation and he would squander it. These are the relations, as shown by the record, which existed at that time between himself, his children and grandchildren. The contestants state that, from their acquaintance and association with the testator, they are of the opinion that he was not competent to make a will when he undertook to do so.

They further insist that, in addition to this lack of capacity, he was unduly influenced by those, or at least some of those named in his will as his chief beneficiaries, to make disposition of his property in the way and manner in which he did. It is shown that he made no conveyance of any of his real estate to his children until after he was more than eighty years of age. The first of these conveyances was to the wife and children of D. C. Lisle, in 1901, at which time he conveyed to them a part of eight-elevenths of two hundred and fifty acres; the balance he gave to them in 1906. The next conveyance was to his daughter, Mrs. Oliver, in the fall of 1903, in

which he gave to her two hundred and forty-eight acres. On September 10th, 1907, he gave to Sam and Clay Hodgkins one hundred and fifty-four acres; and, on the same day, to Thomas Lisle, three hundred and eighty-nine acres. At the same time a deed was prepared conveying to Mrs. Hodgkins three hundred and six acres of land. This deed was acknowledged by him, but was not delivered over to Mrs. Hodgkins at that time, but placed by him in his strong box at the bank, and there kept until the date upon which the will was attempted to be executed, when, according to the testimony, it was directed to be taken out of the box by Clay Hodgkins and delivered to his mother for him. There is proof to the effect that Mrs. Hodgkins and Thomas Lisle looked with a jealous eye upon the attentions which D. C. Lisle was paying to their father about the time that the deed for the land to his wife and children was executed. They saw that by close attention, frequent visits, and other importunities, perhaps, their brother had been able to induce their father to convey to his wife and children this fine body of land. Evidently they profited by his example, for in the course of time we find that each was made the recipient of similar bounties at their father's hand. When the deed to Mrs. Hodgkins was delivered up, all of his real estate, save the lot in the cemetery, had been disposed of. He had nothing left but his personal estate. On Sunday, the day before the will in contest was executed, there was gathered at his house, with Mrs. Hodgkins and her family, Thomas Lisle, D. C. Lisle and his wife, Mrs. Oliver and James H. Winn, a brother of Mrs. D. C. Lisle, whose home was in Winchester and whose occupation was that of practicing law. According to the testimony of all of these, the presence of Mr. Winn was merely an accident. In some way, by chance, he learned that his sister and her husband, Mr. and Mrs. D. C. Lisle, were going to visit their father on that day. He went down to the depot to meet them, and either at his own suggestion or on their invitation, he decided to accompany them. He had no idea of doing so when he went to the depot, but, on the impulse of the moment, he purchased a ticket, went with them to the home of testator, and spent the day there. As the company was in the act of breaking up, as they day drew to a close, he

put on his hat and coat and started to go with the others to the station, but the testator requested him to stay. All agree that he said he wanted him to do some writing for him. The question of a will was not mentioned. Reluctantly, and after some hesitation, he agreed to do so. He went to a nearby store and got some blank paper, and after supper went into the bedroom of testator, and, after all the other members of the family had been excluded therefrom, received from him a statement of the disposition that he desired made of his property. He says that when the question of the amounts that should be given to his grandchildren was under consideration, he advised the testator to give to Mrs. Couchman more than he had indicated he wanted her to have, but that testator told him his conscience told him not to do so. It does not appear that there was any discussion between them over the provisions of that clause in which he gave to the chilldren of his son, J. D. Lisle, save one, $1,000 each, and assigned as a reason why he did not give the property direct to James that he had a mania for speculation and would squander it. Having given him explicit directions as to the disposition to be made of his personal estate, he then directed that there should be put in his will at some appropriate place the following lines: "What conscience dictates to be done, or warns me not to do, is more than Hell to shun or Heaven pursue." The appropriate place for this epitaph, according to the counsel's view, was upon his monument, and in the draft of the will which he made the next day from the notes taken the preceding night, he directed that it be inscribed upon the monument which was to be erected over decedent's grave to his memory. The will was drawn by Mr. Winn, and a codicil, taking from any one of the devisees who should contest the will the portion given to him and putting it into the residuary fund, prepared afterwards. The two papers were then taken to the bank in which Clay Hodgkins was employed, placed in a large envelope, sealed, and then melted wax poured upon the envelope over the seal and the metal seal of the bank placed thereon. In this condition it was delivered to Clay Hodgkins, who took it home. It is testified to that, under the testator's direction, J. B. Eubank and D. A. Thompson (they being the brother-in-law and per-

sonal friends of Thomas Lisle), had been sent for and requested to come to his house on that evening for the purpose of witnessing some writing. They did not know what it was, nor did the person who went after them understand the purpose for which they were wanted. In response to that request they came, and along in the evening, after supper, they were called into the testator's bedroom, and Clay Hodgkins was called upon for the envelope, which he still had in his possession. He brought it into the room, and, in the presence of his grandfather, called the attention of those who had been summoned as attesting witnesses to the fact that the seal was unbroken on the envelope, and in their presence he tore the end off of the envelope, pulling the papers partially out, but permitting his grandfather, the testator, to take them entirely from the envelope. The testator examined them for some time and then stated that they were what he wanted, signed them, and had these attesting witnesses sign there in his presence and in the presence of each other. He stated in their presence that the papers were what he wanted. They were not read. Neither of the attesting witnesses knew the contents thereof. The papers, after their execution, were enclosed in an envelope, taken back to the bank by Clay Hodgkins on the following morning, and placed by him in the strong box, where they remained until his grandfather's death on the 18th day of January, following.

About the execution of this paper and the preparation for its draft there is such an air of mystery as would naturally leave the impression that it was all done and carried out according to a pre-arranged plan to meet a possible contest. It is difficult to understand why, if this was the product of the free and unbiased mind of the testator, and he was qualified at the time to make a rational disposition of his property, he did not let his family know that he was making a will. He had theretofore given to these same people all of his land by deed, and all of these deeds had been put to record save Mrs. Hodgkins. No explanation is offered as to why either he or his lawyer should want to prevent Clay Hodgkins from knowing the contents of that paper which had been prepared by Mr. Winn and which was returned by him to his grandfather. It is in proof that Clay stood very near to him. He had

access to his strong box in the bank, wherein his grand-
father kept all the evidences of his wealth; his stocks,
bonds and notes. Clay had advised him as to what loans
were desirable to make and what not, and yet this un-
signed paper, after it had been prepared was to be taken
by Clay to his grandfather, was not only sealed as papers
are usually sealed, but was in addition sealed with wax
and the imprint of the bank's seal placed therein. We
can conceive of no other reason for these precautionary
steps except to enable Clay to state and demonstrate to
any jury that might be called upon to try the case that
he did not know and had no means of ascertaining the
contents of the papers which he took from Mr. Winn to
be delivered to his grandfather. Nor is there any rea-
son given why the testator, when he was doing what he
wanted to do, should have kept all knowledge of the con-
tents of these papers from those who were called upon
by him to witness or attest his signature thereto. One
was the brother-in-law of his son, Thomas, and the other
a close personal friend of Thomas', as is evidenced by
the fact that, when he was requested to state the circum-
stances under which the will was executed, he declined to
answer, and gave as his reason therefor that he was "too
good a friend of Thomas'." D. C. Lisle testifies that he
had discussed with his father in a way, years before, the
disposition he would make of his estate, and on that oc-
casion his father had told him what disposition he in-
tended making of it. He is the only one of the children
who, according to the testimony, ever discussed with his
father in any way the disposition he would make of his
estate. At the time testator was dictating the terms of
this proposed will to his attorney, he stated, according
to the testimony of Mr. Winn, that he wanted to give
him property where it would do the most good.
Naturally, one would suppose that it would do the most
good if given to those who had nothing. Instead, how-
ever, of making a rational disposition according to such
desire, he gave the great bulk of it to those of his chil-
dren for whom he had previously made ample provision
—more than he would have been able to give to his
grandchildren had he given them all of his personal es-
tate.

We have then, from the evidence, the following facts

established: First, that when decedent attempted to make this will he was a very old man, much enfeebled by a disease, to overcome which the most powerful stimulants and medicines known to the profession had been resorted to. He was so weak at the time that he was confined to his bed, and when talked to by his relatives and friends would frequently break down and cry; second, the great inequality in the disposition of his property among the natural objects of his bounty; third, that although he stated a desire to give his property where it would do the most good, he gave practically all of it to those of his children for whom he had already provided, and gave to his grandchildren, who were shown to be in need, practically none of it; fourth, the statement in his will that he gave no part of his estate to his son James because he had a mania for speculation and would squander it, when he knew that that son, a man almost sixty-eight years old, was an incurable lunatic, paralyzed to such an extent that he could scarcely move, and confined in an asylum for the insane; and fifth, statements made by Thomas Lisle and Mrs. Hodgkins, and someone whose name the testator declined to disclose in order to avoid trouble, which were calculated to and evidently made for the purpose of prejudicing the mind of the testator against his grandchildren with a view of inducing him to disinherit them.

Strong points in favor of the appellees, as developed by the evidence, are found in the fact that the decedent and all of his grandchildren, whom he attempted to discriminate against in the disposition of his estate, were on the very best of terms, and there is not an iota of evidence which would justify the conclusion that he cherished against them any of the ill-will he might have borne their mothers because of their marriage against his will and consent. One of them—a little girl—after her mother's death, lived at the home of Mrs. Hodgkins and had charge of her grandfather's room, and it is in testimony that he was fond of her; and yet she, like her brothers and sisters, is permitted to participate in his estate only to the extent of $500.00. He was, likewise, fond of the Duckworth children, for when they were living in Winchester for the purpose of being near a school and at their own expense trying to get an education, it

is shown that their grandfather spent much of his time with them. Had he not liked them he would not have done so, for, if the evidence demonstrates any one thing more than another, it is that, when the testator did not like anyone, he refused to have anything to with him.

It has frequently been held that gross inequality in the distribution of one's estate among the natural objects of his bounty is not alone an evidence that testator was lacking in capacity, or was unduly influenced in the draft of his will. But it has with equal frequency been held that gross inequality, coupled with other evidence conducing to show that the testator was lacking in capacity, or was unduly influenced in the draft of his will, would justify setting it aside. Here we have a strong case, for we have not only the gross inequality, but also the evidence to the effect that Thomas Lisle was ever seeking to prejudice the testator against his grandchildren and the testator stating in his will a condition which is absolutely untrue, and which he, if in his right mind, must have known to be untrue, to-wit, that his poor, crippled, insane son would squander his estate if anything was left to him. In addition to this, we have the statement of his counsel, Mr. Winn, that he wanted to give his property where it would do the most good; and yet he withholds it from those in need of it and gives it to those well provided for, and as supplementing these facts, the jury was authorized to, and doubtless did, note the very peculiar circumstances under which the will was executed. The accidental gathering at the home of the testator on that fateful Sunday of those of his children who received the bulk of his estate, the fact that they were accidentally accompanied by their lawyer, the brother-in-law of one; the fact that the will was witnessed by the brother-in-law of Thomas Lisle and a friend of his who stood by him closer than a brother; the manner in which the draft of the will was returned from Mr. Winn to the testator, and the circumstances of its execution, all must have impressed the jury as indeed a strange proceeding, where a man was, according to his own free will, making a rational disposition of his property. And they were doubtless likewise impressed by the further fact that, had not Mr. Winn, by the veriest chance, happened to go to testator's home on that day, no will would

have been drawn at all, and all of testator's grand-children would have been permitted to share in the distribution of his estate. They may have believed—and, in justice to him, we believe—that the visit of Mr. Winn, so far as he was concerned, on that day was purely an accidental one. But not so as to appellants. They notified him that they were going. He went to the train at their solicitation, and, he says, invited him to go. Although they say that he went of his own accord, that statement is not a reasonable one, in view of the fact that he knew their father was a sick man. Knowing this, he scarcely would have gone out to his home to spend the day and take dinner with them without having been invited to do so. Mrs. Oliver had been at the home of her father at that time for some days. What communication had passed between D. C. Lisle, Thomas Lisle, Mrs. Oliver and Mrs. Hodgkins is not, and, from the very nature of things, never can be known. But if they purposed among themselves to induce their father to give to them the bulk of his personal estate, they knew perfectly well how to go about it, for they had already induced him to convey to them all of his real estate; and, although none of them were present when he told his lawyer, Mr. Winn, how he wanted the will drawn, it was not necessary that they should be; for any influence that was strong enough to induce their father to agree to practically disinherit his grandchildren, would likewise be cunning enough to impress upon him the necessity of doing it in a way that would avoid the possibility of detection. One desiring to exercise an improper influence does not operate in the open, nor in the presence of those who may be antagonistic to his purposes. As seed time and harvest come at different seasons, so the fruit of an evil and improper influence is borne long after the influence is exercised. During the latter months of his life, or about two months before the date of the execution of the paper, decedent was confined to his home under the control, care and supervision of Mrs. Hodgkins and her family all the time, Mrs. Oliver a part of the time, and D. C. and Thomas Lisle whenever they desired to go. During this time none of these grand-children had been permitted to see him alone. This, too, may have been an accident, but, when viewed in the

light of subsequent events, it has the appearance more of design. But whether accident or design, it was the province of the jury to say, under all of the evidence, whether or not the paper in question was the true last will and testament of Claiborne Lisle; and they, by their verdict, having said that it was not, we feel that the ends of justice are subserved by giving to that finding the stamp of our approval, wherefore the judgment predicated thereon is affirmed.