## Bramel's Executor, et al. v. Crain's Guardian, et al.

(Decided March 4, 1914.)

### Appeal from Mason Circuit Court.

1. Wills—Trial of Contest—Peremptory Instruction.—On the trial of a contested will case a peremptory instruction directing a verdict for the propounders, should not be given, if there is any evidence tending to show a want of testamentary capacity on the part of the testator, or that the will was the result of undue influence exercised upon the testator by others.

2. Wills—Undue Influence—How It May Be Shown.—Undue influence, like fraud, is not easily proven. Only in rare cases can it be shown by the express declarations or overt acts of the person exercising it; for which reason it must necessarily be shown, in the main, by circumstantial evidence.

3. Wills—Province of Jury To Weigh Evidence—When Verdict Will Not Be Disturbed.—It is the province of the jury to say under all the evidence, whether or not the paper in question is the last will and testament of the deceased, and their finding, under proper instructions, will not be disturbed, unless there was no evidence to support it, or the verdict is flagrantly against the evidence.

WORTHINGTON, COCHRAN & BROWNING for appellant.

T. D. SLATTERY, B. S. GRANNIS and JNO. P. McCARTNEY for appellees.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

Mrs. Martha Bramel, widow of Turner Bramel, died August 2, 1911, in Mason County, this State, while at the residence of her daughter, Mrs. Docia Bramel, to whom she was at the time making a visit. On July 24, 1911, she executed a will attested as required by law. The will was duly admitted to probate by the Mason County Court. An appeal was taken from the judgment of the county court, admitting the will to pro-

bate, to the Mason Circuit Court by the testatrix's grand-daughter, Leona Crain, and her father, James Crain, as her statutory guardian, who contested the will on the grounds that the testatrix was not possessed of testamentary capacity at the time it was executed, and that the instrument was procured by the undue influence of the testatrix's three children, the uncle and two aunts of the infant contestant, Leona Crain. There were two trials of the case in the circuit court. On the first trial the jury failed to agree upon a verdict, but the second trial resulted in a verdict in favor of the contestants, upon which judgment was duly entered declaring that the instrument in contest was not the last will and testament of Martha Bramel, deceased; and from that judgment this appeal is prosecuted.

The will is as follows:

"I, Martha A. Bramel, of Mason County, Kentucky, being old but of sound mind and memory and realizing the certainty of death, do make this my last will and testament.

"First. I will that all my just debts and funeral expenses be paid.

"Second. I will and bequeath to my granddaughter, Anna Leona Crain the sum of five hundred dollars, the same to be placed in the hands of the Union Trust & Savings Company of Maysville, Ky., as her trustee, the same to be paid to her with any accumulation of interest upon her arrival at twenty-one years of age, but should she die before arrival at age and without heirs of her body surviving her, then said sum shall be divided between my three children, Jno. W. Bramel, Mary D. Bramel and Lutie Tolle and to their heirs.

"Third. Of my household goods I will to Lutie J. Tolle, one morris chair, one folding bed and equipment, the carpet on the family room, and the dresser in said room, also the hall carpet, and stairs carpet, the chairs in dining room, the Davenport in the family room, and washstand in family room.

"Fourth. Of my household goods I will to Mary D. Bramel, one brass bedstead and equipment, also the parlor carpet, and parlor set of furniture composing four pieces and two willow rockers, and the pictures of Mr. Bramel and myself over the mantel in parlor, and hat rack in hall and kitchen cabinet.

"Fifth. Of my household goods I will to Jno. W. Bramel, one set of furniture, one bed and equipment, one wash stand, one dresser, Grandfather Deleware arm chair, Grandfather Dickeys large picture, one wardrobe, and the side-board in the dining room.

"Sixth. I will to my granddaughter Ida Gault, two wooden rockers, in the family room and the carpet on room over the parlor.

"Seventh. I will to my granddaughter Ethel Bramel, one folding couch up stairs, and carpet in first room up stairs.

"Eighth. I will to my granddaughter, Annie White, my dining room table.

"Ninth. I will to my grandson Alonzo Bramel, my coal oil cook stove.

"Tenth. I will to Miss Gertrude Tolle, who has lived with me for several years, one bed-stead and bed, with sheets, and one pair of pillows.

"Eleventh. I will to my neighbor, Mrs. Robert Carrigan, the matting on my dining-room floor.

"Twelfth. All the balance of my household goods I will that my three children, Jno. W. Bramel, Mary D. Bramel, and Lutie J. Tolle, shall divide same between themselves.

"Thirteenth. The balance of my estate, real, personal, and mixed, I will to be equally divided between my three children, Jno. W. Bramel, Mary D. Bramel and Lutie J. Tolle, that the only real estate that I own is my house and lot on Forest Avenue, adjoining Maysville, Ky. My executor hereinafter named is authorized to sell and convey the same and divide the money received therefor as my other money or property between my said three children.

"Fourteenth. I do name my son, Jno. W. Bramel, as the executor of this my last will and testament, and request that the court will permit him to qualify without surety on his bond.

"In witness whereof, I have hereunto set my hand and seal this 24th day of July, 1911."

Following the writing of the will it was signed by the testatrix and attested by B. F. Chatham and W. W. Bell.

The testatrix was eighty-two years of age at the time of her death. She had enjoyed good health down to within a month of her death. Her last illness began July 9, 1911, and continued until the date of her death, Au-

gust 2, 1911, the latter event occurring about nine days
after the execution of her will. Her illness began with
an attack of acute indigestion, which later developed
into what the physicians testifying in the case variously
designated as ptomaine poisoning, toxic poisoning or
auto-intoxication, a disease arising from the putrefac-
tion of undigested food in the stomach and intestines,
which, upon being taken into the circulation so poisons
the system as to frequently cause death. At the time of
her death Mrs. Martha Bramel owned a house and lot
in the city of Maysville and personal property consist-
ing of household goods, notes, stocks and bonds, the
whole amounting in value to twenty-five or twenty-six
thousand dollars. There had been born to her and her
husband, Turner Bramel, who died in 1903, four chil-
dren; John Will Bramel, Mary Docia Bramel, widow of
Seldon Bramel, deceased, Lutie Tolle, wife of Elwood
Tolle, and Maggie Crain, wife of James Crain. Of the
four children named all were living at the time of the
testatrix's death except Maggie Crain, who died in 1897,
leaving but one child, Leona Crain, then three years of
age. From the time of her mother's death until the sec-
ond marriage of her father three years later, Leona
Crain lived with her grandmother, Mrs. Martha Bramel,
but since that event her home has been with her father
and stepmother.

Some years prior to the death of Mrs. Bramel's hus-
band, Turner Bramel, John Bramel, a brother of the
latter, died, leaving a considerable estate which he by
will devised equally to his sister-in-law, Mrs. Martha
Bramel, and her four children. Mrs. Maggie Crain, the
mother of the appellee, Leona Crain, received her fifth
of the estate of this uncle before her death. After the
death of his brother, Turner Bramel made to each of his
four children an advancement of $5,000. The advance-
ment to Mrs. Maggie Crain was made in a farm of 185
acres situated in Fleming County, one-third of which
seems to have belonged to her mother, Martha Bramel,
and two-thirds thereof to her father, Turner Bramel.
Both parents joined in the deed executed to the daugh-
ter. It appears from the record that Mrs. Crain paid
her father out of the money she had received under her
uncle's will, $3,325.00, which sum with the $5,000 ad-
vanced her by the father in the farm, shows that its es-
timated value at that time was $8,325.00, therefore,
under the deed from her parents Mrs. Crain received

from them in land precisely what the brother and each of her sisters received, $5,000.

When Mrs. Maggie Crain died she owned in her own right in addition to the Fleming County farm, about $6,000, which remained of the money she had received under her uncle's will. The deed to the Fleming County farm was executed to her after the passage in 1894 of the statute known as the Weissinger Act, therefore her husband, James Crain, only took under the statute an interest in the farm of one-third for life, and one-half of her personal estate; so when Mrs. Crain died the appellee Leona Crain, inherited from her the Fleming County farm, subject to her father's interest therein of one-third for life, and about $3,000 of the $6,000 left by the mother at her death. This sum went into the hands of her father, James Crain, who was appointed and duly qualified as her statutory guardian and is yet held by him in that capacity.

When Turner Bramel died in 1903 he left a will whereby he devised to his wife, Martha Bramel, a house and lot in the city of Maysville and $9,000 in money. The remainder of his estate, consisting of real and personal property, he devised in equal parts to this three children, the appellants, John Will Bramel, Docia Bramel and Lutie Tolle, and his granddaughter, Leona Crain, the amount received by each being approximately $10,600. The portion devised the granddaughter was put in the hands of a trustee, the will providing that it should be held in trust for her until she became twenty-one years of age, but that if she should die without issue before she became twenty-one years of age, the trust estate should, in that event, revert to the testator's children, her uncle and aunts.

It is apparent from the record that at the time of the execution of Martha Bramel's will the appellee, Leona Crain, and her mother, Maggie Crain, had together received under the wills of John Bramel, deceased, and Turner Bramel, deceased, property equal in value to that received from the same sources by each of the appellants, the three living children of Turner Bramel and Martha Bramel, so it would seem that the will of Martha Bramel did not make an equal disposition of her estate of $26,000, but gave each of the appellants, her living children,

$8,500.00 and to the appellee, the child of her deceased daughter, $500; whereas an equal distribution of the estate would have given her three children and this grandchild $6,500.00 each, leaving out of the account the furniture and other household effects, which the will disposed of to the exclusion of the appellee, the value of which, though not appearing from the record, must have amounted to $500 or $1,000.

Appellants make no complaint of error in the admission or rejection of evidence, nor do they complain of the instructions, except to say, that in lieu thereof, the jury should have been peremptorily instructed to return a verdict sustaining the will, because of the absence of evidence tending to show either a want of testamentary capacity on the part of the testatrix or undue influence in its procurement; and that in any event the verdict should have been set aside on the ground that it is flagrantly against the evidence. In will contests involving the question of testamentary capacity, the evidence should be permitted to take a wide range in order that every fact throwing light on the issue may be brought out; and the same is true in determining whether the maker of the will was unduly influenced in its execution; particularly, as undue influence need not be exerted over the testamentary act at the time it is done. Walls, etc. v. Walls, etc., 30 R., 948; Barber's Exr. v. Baldwin, 138 Ky., 713; McConnell's Exr. v. McConnell, 138 Ky., 783; Threlkeld v. Bond, 29 R., 177; Lancaster v. Lancaster's Exr., 27 R., 1127; Lisle v. Couchman, 146 Ky., 345. A verdict in a will contest, like that in any other case, cannot be disturbed if there is any evidence to sustain it; so if there is any direct evidence or the circumstances are such as to show, that the maker of the will was not, at the time of its execution, possessed of the requisite testamentary capacity, or that the instrument was procured by undue influence exercised over the mind of the maker, it is peculiarly within the province of the jury to determine from such evidence or circumstances the disputed questions of fact. In the light of these general principles it will be proper to consider the evidence appearing in the record.

First of all, it is not apparent from anything appearing in the record that the textatrix, Martha Bramel, was lacking in affection for her granddaughter, the appellee, Leona Crain. On the contrary, her affection for and interest in the granddaughter was at all times manifest.

She kept her from the time of her mother's death down to the second marriage of her father, visited her at the home of the father and step-mother at least once each year, had the granddaughter to frequently visit her, and regularly exchanged letters with the granddaughter while she was off at school. In brief, there was nothing in her bearing toward or treatment of the grand-daughter that differed in any way from such relations as usually exist between a grand-parent and grand-child. There was nothing in the conduct of the granddaughter that could have destroyed the grandmother's affection for her, as she was shown to be an obedient, exemplary young lady. In view of these facts there was nothing that could have given any apparent cause for Mrs. Bramel in disposing of her estate, to give the grand-daughter any less of her property than was given to the appellants, the latter's uncle and aunts. It cannot be said that the inequality in the disposition of the testatrix's estate, should of itself be declared to show a want of testamentary capacity in the testatrix; yet it was a fact of more than ordinary significance, to be considered by the jury, in connection with the remaining evidence heard by them, in determining the questions of testamentary capacity and undue influence.

In the second place, it appears from the evidence that a year or more before the execution of the will the testatrix had been heard to declare, by Mrs. Crain, her intention never to make a will; and shortly before making this declaration, when advised by W. W. Ball, who had written the wills of her husband and his brother, John Bramel, and subsequently wrote hers, to make a will, she declined to do so. This leads to the inquiry, what caused her to change her mind and make the will and what were the circumstances under which it was executed? The evidence shows that this change of mind occurred in her last illness and but nine days before her death, at a time when she was confined to her bed with an illness calculated to weaken her mind and will power, and also when she was laboring under great depression or despondency of mind. The witnesses who saw her during that illness testified that a day or two before the will was written, she claimed to have had a dream or vision which she conceived to be in the nature of a warning of some sort; and that after professing to have seen this vision she did not regain her usual cheerfulness of spirits. At this time she was at the house of her daughter, Mrs. Docia Bramel, sur-

rounded by her son and daughters, Mrs. Bramel and Mrs. Tolle. They alone testified that she requested her son to send for W. W. Ball, saying that she desired him to do some writing for her. The latter on the same day communicated with Mr. Ball over the telephone and in the afternoon Mr. Ball and her pastor, the Rev. Mr. Chatham, reached her bedside. Before their arrival, however, according to the testimony of the appellants, her three children, her son, John Will Bramel, had reduced to writing at her request, as claimed by them directions which she gave as to the disposition to be made of the several articles of furniture, family pictures, rugs, carpets and other personal effects in her Maysville residence. The articles thus disposed of included all of her tangible personal property, none of which was bequeathed to her granddaughter, the appellee. Upon the arrival of Mr. Ball and Mr. Chatham they had an interview with the testatrix, in which the former obtained an expression of her desire that he write her will and the latter ministered to her spiritual needs. Following this interview, Mr. Ball took his seat in the room and wrote the will, before beginning which he was handed the memorandum disposing of the testatrix's household effects, previously made by the appellant, John Will Bramel, with the statement in substance by the latter that it was his mother's wish that its contents be made a part of the will and this was done by Ball, and the property mentioned in the memorandum and the disposition therein made of it, was set out in the will as expressed in the memorandum.

It appears from the evidence that the appellant, Docia Bramel was in the room with the testatrix during the writing of the will. It further appears from the evidence furnished by the appellees, Leona Crain, James Crain, the wife of the latter, and other persons residing in the neighborhood who visited the testatrix on the day of the execution of the will, or just before and just after the day of its execution, that the testatrix manifested no interest in what was going on about her; that the only talking she did was in responding briefly to inquiries that would be made as to her health and condition; that she was weak and afflicted with paralysis of the bowels and that she then paid no more attention to her granddaughter, Leona Crain, than to others by whom she was visited, and did not advise her of the execution of the will; nor did the appellants mention it to her. The only evi-

dence tending to show the intentions of the testatrix with respect to her granddaughter was furnished by the appellant, John Will Bramel, from whose testimony it appears that while preparing the memorandum which was later embraced in the will by the draughtsman, Ball, he had to remind the testatrix that she had forgotten or was leaving out of the paper her granddaughter, Leona Crain. The testimony on this point is as follows:

"Q. While you were in there (making a memorandum for the testatrix), was there any statement made by you to her with reference to Leona Crain?" "A. Yes, sir." "Q. How did that come up, as you recollect?" "A. When she designated these, I appealed to her, I said, 'Mother, remember Leona Crain is one of the heirs.' She said: 'I am aware of that fact.'" "Q. That was her answer to you, 'I am aware of that fact?'" "A. Yes, sir, I just spoke of it. I do not know why I did it, I just spoke of it." "Q. That was your mother's answer?" "A. Yes, sir."

In addition to the evidence referred to there was testimony from several physicians, some of whom attended the testatrix during her last illness, as to the symptoms and effect of toxic poisoning upon the human body. Among other questions asked Dr. Cooper, and his answers thereto, were the following:

"Q. What are the usual symptoms of toxic poison, as you have described it, or auto-intoxication?" "A. Marked depression, usually a stupor, sluggishness of the system, of the mind and mental faculties; often they are irritable and bad tempered, but usually sluggish and depressed." "Q. What is its effect, and how manifested, in regard to the will-power of the one suffering?" "A. Well, that would necessarily depend upon the degree. If it were to a marked degree, it would necessarily affect the will-power. It dulls the mind and makes them susceptible to suggestion. Anything that was placed before them they would grasp readily, but not offer anything of their own accord; they lack initiative." "Q. Are the young or old more susceptible to the effect of that toxic poison?" "A. The old." "Q. Why." "A. Because there is a greater tendency on the part of the old person to degeneration of the brain than in a young individual. The natural tendencies of age are enfeeblement of body and also enfeeblement of mind." "Q. I will ask you whether or not this toxic poison or auto-intoxication frequently occurs in old age, in persons of advanced years?"

"A. It does, yes, sir." "Q. Now, what is the natural and usual progress of auto-intoxication which results in death; describe its course to the jury?" "A. Well, the action of the disease is that they become more stupefied as the disease progresses, have little to say and talk little except when questioned. They will answer questions, but usually volunteer very little information of any sort. The mind becomes dull and stupid and frequently the mentality is changed, the disposition is changed." "Q. What do you mean by a change of disposition, Doctor; explain a little more fully, please, sir?" "A. Well, a person who is ordinarily good natured and easy to get along with, becomes very irritable and cross." "Q. Is it a fact that the opposite effect may frequently take place?" "A. Yes, sir, frequently so." "Q. What effect is it likely to have and does it have upon ones likes and dislikes amongst their friends and relatives?" "A. The people that are nearest to them and dearest they often take the greatest dislike to. On the other hand, they frequently become very fond of some individual that they have cared nothing about through their lives." "Q. That is characteristic of that sort of case?" "A. Yes, sir." "Q. Does it result in the later stages in any serious condition of the digestive tract or bowels, and if so, what follows along that line, paralysis?" "A. I don't understand the question." "Q. Does it in severe cases, result in paralysis of any part of the body?" "A. Yes, sir, it does."

On the other hand, Dr. Brand, the family physician of the testatrix, while not disagreeing with the other physicians as to the symptoms and effect upon the human body of the disease referred to, testified that, in his opinion, at the time of the execution of the will she had mind and memory sufficient to know her estate and the natural objects of her bounty as well as her duty to them, and to make a rational disposition of her estate, according to a fixed purpose of her own. Ball, the draughtsman of the will, and Mr. Chatham the minister, also the appellants and Miss Gertrude Tolle, a nurse who was with the testatrix during a great part of her illness, testified to the same effect.

We think it apparent from the record that there was evidence conducing to prove the want of testamentary capacity on the part of the testatrix which required the submission of the case to the jury, and also that there was evidence, though less definite upon which to submit

the question of undue influence to the jury. As well said in Livering's Exr. v. Russell, 30 R., 1185:

"Undue influence, like fraud, is not easily proven. It is only in rare cases that it can be shown by the express declaration or overt acts of a party that he procured the execution of a will by undue influence. The exercise of this power over the mind of the testator must necessarily be shown, in the main, by circumstantial evidence. All that can be done is to prove certain acts and facts, and it is from these, when connected into a composite whole, that the evidence of undue influence is made to appear."

In Lisle v. Couchman, supra, it is on this subject said: "One desiring to exercise an improper influence does not operate in the open, nor in the presence of those who may be antagonistic to his purpose: As seed-time and harvest come at different seasons, so the fruit of undue influence is borne long after the influence is exercised."

Summarizing the evidence, what is the situation presented? It is that Mrs. Martha Bramel, who had previously rejected the advice of her friend to make a will and declared her intention never to do so, is suddenly attacked with an illness from which she does not recover, and in the midst of which she sees a vision or has a dream, the depressing effect of which remains with her until death claims her for its own. In this last illness, her mind, weakened with the weight of her eighty-two years of age, and the poison of the disease with which she is afflicted, while lying upon her bed inattentive to those about her, only speaking when spoken to, and surrounded by her three children, who of all others were most interested in having her make such a disposition of her estate as was done by the will, she suddenly has a change of mind on the subejct of making a will and concludes, according to the testimony of her three children, to make one. One of them, the son, procures the attendance of a draughtsman, but in the meantime, and while awaiting his coming, himself makes a memorandum in which, it is declared, were expressed the testatrix's wishes as to the disposition to be made of the household effects therein mentioned. This paper, upon the arrival of the draughtsman of the will is handed to him by the son with the statement that it is the testatrix's request that it be made a part of the will to be prepared. The wife of the son meets the draughtsman and minister at the station as they come to attend the bedside of the tes-

tatrix and carries them to the house where the latter is lying in her last illness. One of the daughters, Mrs. Docia Bramel, remains in the room with the testatrix while the will is being prepared by the draughtsman. The husband of the other daughter, Mrs. Tolle, advised Ball after he had been informed over the telephone by John Will Bramel that the testatrix wished him to do some writing for her, "that before he left home on Sunday, it was the understanding that Mrs. Bramel wanted you to write her will."

The foregoing facts and circumstances conduce to show such a situation as the appellants would have been reasonably expected to place themselves in, had they been actuated by a purpose to procure the execution of a will by their mother and to influence her to make such a disposition of her property as would meet with their wishes, and at the same time conceal their connection with the transaction. Adding to these facts and the inferences fairly deducible therefrom, the further evidence with respect to the age of the testatrix, the loss of her health, weakening of body and intellect and depression of spirits, produced by the disease with which she was afflicted, and her sudden change of mind on the subject of making a will, it may well be said that a case was presented which should have gone to the jury and was properly submitted to it by the trial court. We conclude, therefore, that there was evidence of a want of testamentary capacity on the part of the testatrix, and also of undue influence exerted upon her by others in causing the execution of the will, of such weight and force, that we do not feel authorized to set aside the verdict on the ground that it is flagrantly against the evidence.

Wherefore the judgment is affirmed.