## Sykes, et al. v. Hurd, et al.

(Decided June 23, 1922.)

### Appeal from Warren Circuit Court

1. Deeds—Consideration—Care and Support.—An agreement to support and care for one for the rest of his life is a valid consideration for the conveyance of real estate, and, if the promised consideration is faithfully performed, the contract will be upheld.

2. Deeds—Finding of Chancellor.—Evidence examined and held to support the finding of the chancellor that the grantor at the time of executing the deed had sufficient mind to understand the subject of the contract, its nature and probable consequences.

3. Deeds—Surrender or Destruction of Deed.—The surrender. of a deed to the grantor or its destruction by the parties thereto, with the intention of nullifying the conveyance, is insufficient to divest the grantee of title or to reinvest title in the grantor.

4. Deeds—Consideration—Destruction of Deed.—Where the consideration moving from the grantee at the time that the deed was destroyed had become an executed consideration, the transfer of title is a thing accomplished, and the destruction of the deed by the common consent of the heirs of the grantor and the grantees does not divest the grantees of title or effectuate a transfer of title to the heirs of the grantor.

GAINES & GARDNER and SIMS, RODES & SIMS for appellants.

T. W. and R. C. P. THOMAS and JAMES F. CORN for appellees.

OPINION OF THE COURT BY JUDGE MOORMAN—Affirming.

Y. W. Sykes died a resident of Warren county, Kentucky, on January 23, 1919. He left four surviving children, Mose Sykes, Sam Sykes, Nola Moore and Patsy Hurd. In November, 1918, he had conveyed to his daughter, Patsy Hurd, and her daughter, Amber Scott, the farm on which he resided, consisting of 182 acres of land, which was all of the real estate that he owned. Thirty-three acres of the tract were deeded to Amber Scott in fee and the rest of it was conveyed to Patsy Hurd for life with the remainder in fee to the granddaughter. The consideration for the conveyance was that Y. W. Sykes, who was then seventy-six years of age and a widower, was to have a home with his daughter and granddaughter on the farm and they were to take care of and support him, keep and care for his horse, attend to his wants in case of illness, and after his death erect a reasonably inexpensive monument over his grave.

The deed of November, 1918, was delivered to Amber Scott and was in her possession at the time of Sykes' death. She and her mother and stepfather were then living on the farm, and on the evening of the day that Sykes was buried a family conference was held at his home, at which time Patsy Hurd was urged to destroy the deed, it being insisted by the other heirs that it was not fair to them for her and her daughter to have the farm. The following morning two neighbors were called into the conference and the deed was destroyed. Later Mose Sykes qualified as administrator of his father's estate and brought a suit to sell the farm, and in that suit Patsy Hurd and Amber Scott set up their claim to the land under the deed of November, 1918, a copy of which had been preserved. The other children contested the validity of the deed alleging first, that at the time it was executed Sykes was of unsound mind, and second, that the destruction of the deed by the common consent of the grantees and the heirs at law divested the grantees of any title to the farm and invested the four children with an equitable title to it, which it is insisted a court of equity should enforce. The circuit court denied both contentions, and upheld the deed. From that judgment this appeal is prosecuted.

The farm is worth from $3,500.00 to $4,000.00. The three appellants were brought up on it, and, until they were married, assisted in cultivating it and in maintaining the family. Y. W. Sykes was an industrious man but he was not successful financially, as he had succeeded in accumulating only about $2,000.00 in addition to his farm. He was extremely economical in his habits and with his family. He was an honorable man and so far as the evidence shows lived a correct life. As his children grew to manhood and womanhood and were married they settled about him, but it does not appear that he contributed in any considerable way to their start in life. Patsy Hurd lived with her father until about two years before his death. During all of that time she assisted in the housekeeping and did the kind of work on the farm that a man usually does. After her mother's death, which occurred in 1914, she continued to help on the farm and to run the house until 1917. Some years before she had married Albert Hurd and he lived with her at the home of her parents. After her mother's death, according to her testimony, her brother, Mose Sykes, objected to her stay-

ing at the home of her father, and in 1917 she and her family left and moved to a place nearby. Later they went to Indianapolis. Amber Scott went with her mother and she married in Indianapolis, but a few months after her marriage her husband committed suicide. When Patsy Hurd and her family left the home of Y. W. Sykes he procured a tenant, but had trouble with the tenant, who soon left, and then his son, Sam Sykes, came to live with him, but Sam Sykes only resided there for a year and he left on account of a disagreement with his father. Sam and his father had some litigation, but that appears to have been compromised before the case came to trial. In the summer of 1918 Y. W. Sykes visited Indianapolis where his daughter, Patsy Hurd, was living and where his other daughter, Nola Moore, also resided. He spent four days there, three of them with Patsy Hurd and Amber Scott, who was then a widow living at her mother's home. In November of the same year Patsy Hurd returned to Kentucky on a visit to her father and at that time he asked her to come and live with him, telling her that he would deed the farm to her and her daughter if they would return and take care of him for the rest of his life. Mrs. Hurd testified that she refused to give him an answer without first consulting her husband. She returned to Indianapolis in about ten days and Y. W. Sykes then went to the office of his lawyer in Bowling Green and had him prepare the deed in controversy. It was signed, acknowledged and mailed to Amber Scott at Indianapolis. Within a short time Mrs. Hurd and her daughter returned to Kentucky and Mrs. Hurd's husband followed in a few weeks. They made their home with Sykes until his death, which occurred the following January.

An agreement to support and care for one for the rest of his life is a valid consideration for the conveyance of real estate. If the promised consideration is faithfully performed the contract is enforceable and it is the duty of the courts to uphold it. (Waters v. Cline, &c., 121 Ky. 611; Sturgeon's Admr. v. McCorkle, 163 Ky. 8; Skinner, et al. v. Rasche, et al., 165 Ky. 108.) Recognizing the enforceability of contracts of this kind, counsel for appellants attack the deed in question on the ground that Sykes was of unsound mind at the time he executed it. In this connection they call attention to the fact that he could have leased the farm during the rest of his

natural life for a sufficient amount to insure a comfortable living, or that he could have let it to some suitable person who would have taken care of him for the use of it. It is said that there was inadequacy of consideration and that fact indicates the absence of contractual capacity. Ordinarily that is true but the fact is ineffectual here when considered in conjunction with the situation of the grantor and his relation to the appellees. The evidence shows that an arrangement somewhat similar to that suggested by counsel was made with a tenant, after Sykes' daughter left in 1917, but it proved unsatisfactory, and the following year, with that end in view, he entered into an agreement with his son, Sam, but that too was unsatisfactory. . Mrs. Hurd was undoubtedly a very dutiful daughter. She had been kind to her mother and father over an extended period of years. In their illnesses she attended them, and she did the work of a man on the farm in addition to caring for the house. Amber Scott was born in the home of her grandfather and spent her childhood there. He affectionately called her "Johnnie." After his wife's death he was lonely and these two women were better able than any one else to make a home for him. He was devoted to them, the latter years of his life had been spent in their society, they knew his wants, his idiosyncrasies, and the evidence shows that they were not sparing in their affections for him. In these circumstances it was not unnatural that he should crave their society and attentions; and even though his relations with his other children were cordial and affectionate, his greater affection for his daughter and granddaughter furnish ample reason for his desire to have them about him and his wish to provide them with a home for the future. It is our opinion, therefore, that the alleged inadequacy of consideration is not a material circumstance tending to show unsoundness of mind.

The proof is conflicting on the subject of the grantor's contractual capacity at the time the deed was executed. There is some evidence showing that he was forgetful and that he would tell the same story two or three times to the same person within a few minutes; that on one occasion he could not find the livery stable in Bowling Green that it had been his custom to visit when in that place; that he had been heard talking to himself at times; and that he frequently told his family after his wife's death, that she had returned the night before and he had

talked with her and had begged her to stay but that she could not stay. These circumstances are pointed to as evidences of unsoundness of mind and as manifesting inability properly to comprehend the consequences of his act in making the conveyance of November, 1918. Their tendency in that direction may be admitted, but as we appraise their effect on the question in issue they are not of serious import. It is a matter of common knowledge that many men of unquestioned contractual capacity are subject to the same eccentricities and beliefs that are shown in the proof for appellants to have been possessed by Y. W. Sykes. The mental weakness that will invalidate a deed must amount to such infirmity as renders the grantor incapable of comprehending the subject of the contract, its nature and probable consequences. (Lewis, et al., v. Lewis, et al., 194 Ky. 172.) The evidence does not show Y. W. Sykes to have been afflicted with such a degree of mental weakness as would invalidate his act. If there were no opposing evidence to that introduced by appellants we would not feel justified in cancelling the deed, but many disinterested witnesses testified that they knew the grantor in November, 1918, and that he was of sound mind and capable of understanding the nature and consequences of his act in conveying the farm to his daughter and granddaughter. Weighing the evidence as a whole the chancellor found that he possessed contractual capacity, and with that finding we agree as we are of opinion that the weight of the evidence clearly sustains it.

The other contention of appellants is that the destruction of the deed on January 25th, with the consent of the grantees, divested them of the title and vested all of the heirs at law with the equitable title to the farm which a court of equity should enforce. The argument on this question is supported by the citation of a number of authorities from other jurisdictions. We do not consider it necessary to discuss them, although in some of them it is held that the destruction of an unrecorded deed by the parties thereto, with the intention of both to nullify the conveyance, creates such an equitable right or interest in the grantor that the grantee will be considered as holding the title in trust only for the benefit of the grantor. This has never been the rule in Kentucky. It is a deviation from the general rule and is sometimes upheld on the theory that in order to carry out the inten-

tion of the parties and to defeat the claim of the grantee the doctrine of estoppel will be applied. The rule is sound and should be applied where there are intervening innocent claimants, but there are no such claimants in this case, and in this state, where there are no intervening claimants for a valuable consideration, the general rule is different, for it is held here that the surrender of a deed to the grantor or its destruction after the title has passed to the grantee is insufficient to reinvest the title in the grantor. Under our rule nothing short of a reconveyance can accomplish a transfer of title to the grantor. (Rittenhouse v. Clark, etc., 110 Ky. 147; Austin v. Moore, 188 Ky. 832; City National Bank of Cairo, Ill. v. Anderson, 189 Ky. 487; Lacey v. Layne, et al., 190 Ky. 667.) Moreover, it matters not whether the grantor and grantee voluntarily agree to the destruction of the deed or whether the grantee makes such agreement, as appellees claim they did in this case, under a misapprehension of the force and effect of the deed, since in neither event does the destruction of the instrument divest the grantee of title or reinvest title in the grantor. In this view of the law we need not consider the evidence pertaining to the controversy as to whether Patsy Hurd and Amber Scott voluntarily destroyed the deed or destroyed it under the erroneous belief that it was ineffective.

Aside from the considerations mentioned there are other reasons why the rule announced in the cases relied on by appellants can not be applied to this case. One of them is that the consideration moving from the grantees at the time that the deed was destroyed had become an executed consideration, the service had been performed and the transfer of title to appellees was a thing accomplished. Another is that the grantor in the deed did not consent to its destruction, and there was not a voluntary destruction of it with the consent of the grantor and grantees. When the deed was destroyed the title of the grantees had been perfected by reason of the complete performance of the consideration, and it was not within the power of the grantees and appellants by destroying the deed to divest Patsy Hurd and Amber Scott of their title to the property. Y. W. Sykes had the right and power to make the deed for the consideration stated therein. The fact that the services performed by the grantees did not extend over so long a period of time

as was perhaps anticipated by the parties at the time the contract was entered into, does not affect its validity or render it susceptible of successful attack on the ground of inadequacy of consideration. This seems to have been the view held by the chancellor which in our opinion is correct.

The judgment is, therefore, affirmed.