# Hensley et al. v. Hensley et al.

(Decided September 24, 1929.)

FORESTER & CARTER and W. E. SETTLE for appellants.

LEE & SNYDER and E. H. JOHNSON for appellees.

OPINION OF THE COURT BY COMMISSIONER HOBSON—
Affirming.

Milton Hensley died a resident of Harlan county, leaving eight children surviving him. This suit was brought by six of his children against two of his sons to whom he had made deeds for part of his property, alleging that he was of unsound mind when the deeds were made, and that the deeds were obtained by undue influence, and were without consideration. The allegations of the petition were denied by the answer, which also pleaded that the deeds were executed pursuant to a contract made between the father and these two sons many years before. Proof was taken, and on the final hearing of the case the circuit court dismissed the petition. The plaintiffs appeal.

Milton Hensley was over 80 years of age. He was a soldier in the Civil War, and drew a pension of $50 a month. The plaintiffs introduced a number of witnesses who testified that from 3 to 7 years before his death he

was not of sound mind; that he would talk to himself as he went along the street; that he acted queerly, and he would walk up to a man and grab him by the shoulder and shake his fist at him and ask him if he was ready to fight, and would do other like things. On the other hand, it is shown that none of these men ever was offended; that this was his way of joking, and everybody understood it. He was very fond of talking and joking. He owned in the town eight houses which he rented out, and collected the rents regularly. He kept a deposit account at the bank and also a checking account, and he always knew how each account stood. The overwhelming weight of the evidence by the bankers and merchants, the officers of the county and of the town, is to the effect that he was of sound mind, at least until his last sickness. He was a member of the petit jury in the circuit court, and also a member of the grand jury at a subsequent term not long before his death, and was a candidate for police judge of Harlan at the August primary in 1925. He was a man of natural force of character, and, while he was peculiar in some of his ways, the evidence leaves no doubt that he was of sound mind until he was taken sick. This is practically conceded by the attorneys for the appellant, but they earnestly insist that he was not of sound mind when the deeds were executed. He was taken sick early in December, 1925, and was under the care of a doctor, but was going about the town as usual on January 5, 1926, when he executed the deed to the appellee Reed Hensley for two lots in Harlan which were not a part of his home place. He remained at home until February 2, 1926, when he went to Pineville for treatment. He remained at Pineville until February 13. He then returned to Harlan, and on February 17 he executed the deed to G. W. Hensley and Reed Hensley for the home place. Each of these deeds was lodged for record on the day after it was executed. He died on March 5, 1926, or about two weeks after the second deed was executed.

The three doctors who treated him during his sickness testified in the case. Dr. W. R. Parks testifies that he came to him for treatment on December 3, 1925, at Harlan, and he saw him after this on these dates: December 8, January 14, January 17, and January 24. The first three visits were made at his office and the last two at his house. He spent about 30 minutes with him each time. His trouble was a leaking heart, and, as far as he could see, there was nothing wrong with his mind. He

had rather a long talk with him in his office on the first visit, but that he did not see him after January 24.

Dr. Tilman Ramsey, who lives at Pineville, testified that he treated Hensley in Pineville in February, 1926, and that his trouble was high blood pressure, heart, and kidney trouble in a very advanced stage; that it had a bad effect on his nervous system and his mental powers. His mind was not good while at Pineville; he had delusions. At the time he was there, the witness did not think he was in condition to transact business. He saw him first on February 2d. He waited on him about 10 days; he prescribed for him twice after he went home; the last prescription was sent on February 26. The treatment he gave was to reduce the blood pressure. He obtained a slight reduction. His mental delusions were at intervals, not continuous. The treatment he gave was intended to clear this up. After Hensley went home, he had two reports from some of the family over the phone that he was better. He could not say what his condition of mind was from the time he last saw him until his death.

Dr. J. W. Nolan, who lives at Harlan, was also called to see him on February 19, 1926. He was called to see him at his home, and found that Hensley was suffering from high blood pressure, but that it was not as high as it had been. His heart action was very bad, and the knee reflection gave very little response. He had no temperature. He told the doctor he was 80 odd, and impressed the doctor as being rather vigorous for a man of his age. He told the doctor he could not describe how he felt; that at times he felt that he was floating about in the air, and that at other times he was not conscious about where he was. Considering his age and the examination that the doctor made of him, and the things he told him about his condition, the doctor was not willing to make a positive statement as to whether or not he was mentally unbalanced or had a normal mind at that time, for he only saw him once. He gave him a heart stimulant and a hypodermic there at the house, and otherwise prescribed for him.

There is practically no evidence that Hensley's condition on January 5, when he went to the courthouse himself and went to the clerk's office, and had the clerk to write the deed to his son Joe, was different from what it had been for a number of years. But there is much testimony in the record by different witnesses for the appellant that while he was at Pineville, and after he came

back, he was at times apparently not at himself. On the other hand, there are probably as many witnesses testifying for the appellees that at other times he was fully at himself. One of the officers at the bank, where he did business, went to the house on February 17, and took his acknowledgment to the second deed. He had known Hensley for years, and says that he was perfectly normal, and that he fully understood the deed. This testimony is confirmed by others who saw him then or afterwards, and the county clerk testifies that before January 5 Hensley had told him that he wanted him to write some deeds for him, and that he only wrote one that morning on account of the fact that the lady who used the typewriter was busy with other work.

The proof as to the consideration for the deeds is this: Reed Hensley was the youngest child, and weakly. His eyes were bad, and his mother insisted that he should be provided for. When she was dying, she made this request of her husband, and he promised her to do so. The two lots that he deeded to Reed cost him $3,500 shortly before he made the deed to him, and he made the deed to him as an advancement and to carry out the promise to his mother. As to the consideration of the other deed, the proof for the appellees is in substance this: In 1916 Mrs. Hensley's health became very bad. Reed was then 15 years old, and lived with them. She was unable to do her own work; somebody had to look after her. G. W. Hensley was then living on his father's farm in the country and working at a coal mine, where he received a salary of about $225 a month. Milton Hensley came down there, and told his son her condition, and proposed to him that, if he would move up to the town and live in the home and take care of him and his mother as long as they lived, he and Reed should have the home place at their death. Two witnesses testify to hearing this proposition made. They do not testify to hearing G. W. Hensley accept it, but it is clearly shown that he did at once break up on the farm and move to Harlan, about 10 miles away, and that he did take care of the old people until his mother died about 2 years later, and his father lived with him until he died.

The two witnesses by whom the contract is shown are impeached by several witnesses, who say in effect that they gamble and drink; that their moral character is not good. But, on the other hand, it is conclusively shown that in 1919, or about a year after his wife's death,

Milton Hensley made his will, which was duly executed before witnesses, by which he devised to G. W. Hensley and Reed Hensley the home place, and devised the remainder of his estate equally to his other six children. After this will was written, Milton Hensley and his son Hiram Hensley became estranged. Several lawsuits followed between them, and his daughter Sadie sided with Hiram. So in 1923 Hensley went to another lawyer, and had him to write another will for him, which he duly executed before two witnesses, and in this will, as before, he left the home place to G. W. Hensley and Reed, and directed the remainder of his property to be divided among his other children, leaving out Hiram and Sadie. After the second will was made, according to the proof for appellants, the old man said that wills were sometimes broken and so he went to the county clerk to get him to write him some deeds, and for this reason subsequently made the two deeds in question. This testimony is confirmed by the testimony of ten or more witnesses who testify that at different times and on different occasions the old man told them that the home place was to go to G. W. and Reed at his death. The home place consists of 8 acres of land with eight houses upon it in Harlan, and was of value $12,000. He also owned another lot in Harlan worth about $3,000 and the farm 10 miles away, assessed at 60 acres, for which he had been offered $20,000, but was not so valuable when he died. The extent of his personal property is not shown, except that he had about $2,000 in bank. There is no direct evidence of undue influence or that either deed was procured by anything said or done by either of the grantees. The clear weight of the evidence is that he was of sound mind on January 5th when the first deed was executed. So the only remaining question to be determined is, was the second deed valid?

Two questions are presented by the record: (1) Was the deed to the home place made pursuant to a contract made in 1916 to this effect? (2) Was Milton Hensley, at the time the deed was made, of sufficient mind to execute it?

1. The effect of the deeds is precisely the same as the effect of each of the wills, for each deed contains this provision: "The first party, however, reserves to himself the right to the use, occupancy and control of the foregoing described property during his natural life." The deeds therefore simply carry into effect the long-

settled purpose of the father, as shown by both of his wills, to give his two youngest sons the home place. The proof is clear that G. W. Hensley and his wife had faithfully cared for the old man, and that he was entirely satisfied with their performance of the agreement.

2. Appellants show, by a number of witnesses, declarations by the father to the effect that he would not sell his property and would leave it to his children to do that. But these statements are not inconsistent with his purpose to carry out the agreement as to the home place, for this would be divided between Reed and G. W. Hensley, and the other children could divide the remainder of the estate. He owned in addition the farm in the country and another lot in Harlan. While there is much evidence that at times the old man was not himself, it is well known that old persons suffering from high blood pressure or other like troubles may be incompetent at one time and be thoroughly competent at other times, when the trouble had subsided. While the old man was in a bad condition over at Pineville from high blood pressure the medicine the doctor gave him was given to remove the high blood pressure, and so the proof of his bad condition then does not contradict the proof for the appellees showing that at the time the deed was made and about that time he was thoroughly at himself. The rule is well settled that, although a grantor in a deed is extremely aged, his mind weak as compared to what it has been, and his demeanor on occasions eccentric, yet, if at the time the deed is made, he understands the nature of what he is doing, the property he is disposing of, and how he is disposing of it, the deed, if fairly obtained, is valid. Jones v. Stamps, 194 Ky. 377, 288 S. W. 762; Sykes v. Hurd, 195 Ky. 560, 242 S. W. 853; Delaplain v. Grubb, 44 W. Va. 612, 30 S. E. 201, 67 A. L. R. 788; 18 C. J. 218, and cases cited.

In Belcher v. Belcher, 202 Ky. 107, 259, S. W. 54, 55, a case not unlike this, the court thus stated the rule:

"It is doubtless true that the land was worth more than George paid for it, but a father who has sufficient intellect to understand the nature and effect of his act, and is not the victim of fraud or undue influence, may give his land, or sell it for less than it is worth, to a son who has been his mainstay in the declining years of his life, and had stood by

him when others under the same obligation had failed him.''

Again in Norton v. Norton, 219 Ky. 614, 294 S. W 191, 192, the court said:

"Where the transaction involves the conveyance of land by a father to his son in consideration of the son maintaining and caring for his parent, if the transaction be free from fraud and undue influence, a less degree of mental capacity is required than when the parties are engaged in some other transactions. A grantor must be held to have sufficient mental capacity to execute a valid deed, if, at the time it was made, he understood the business in which he was engaged and knew the extent and value of the property and how he wanted to dispose of it, and was able to keep such facts in his mind long enough to plan and effect the conveyance without prompting or interference from the outside.''

To same effect see Briscoe v. Briscoe, 225 Ky. 804, 10 S. W. (2d) 294, and Bryant v. Bryant, 225 Ky. 821, 10 S. W. (2d) 276.

This rule should clearly be applied where, as here, the deed was made to carry out a long-settled purpose of the grantor, which he had expressed in his will, and the conveyance is only another form of doing what he had done in his will when his mind was entirely unimpaired.

It is the settled rule of this court not to disturb the finding of the chancellor on a question of fact, where on all the evidence the mind is left in doubt as to the truth. Under this well-settled rule the judgment of the chancellor here cannot be disturbed.

Judgment affirmed.