## Stege et al. v. Stege's Trustee et al.

(Decided December 19, 1930.)

(As Modified on Denial of Rehearing March 6, 1931.)

198

DAVID A. McCANDLESS, MORTON K. YONTS and EUGENE HUBBARD for appellants.

HUMPHREY, CRAWFORD & MIDDLETON for appellees.

OPINION OF THE COURT BY COMMISSIONER STANLEY—Reversing.

This is a suit by four of the children of Mrs. Elizabeth Stege, deceased, to set aside a deed to her grandsons. It is based upon allegations of mental incapacity and undue influence. Questions of fact are primarily involved, for it is elementary law that capacity—legal and mental—of the parties is a necessary and constituent element of a simple contract, as well as of a valid testamentary disposition of property; also that there must be voluntary and complete assent of one so capacitated, and, if an assent is given by reason of undue influence—a species of fraud which the courts do not

undertake to define with precision—it will be considered as if it had never been given, and the instrument will be held ineffectual and void.

At the time the deed involved was executed, on November 22, 1922, Mrs. Stege was about 83 years old. She lived a little over a year thereafter. She suffered from well-advanced Bright's disease, enlargement of the heart, hardening of the arteries, and diabetes of such a stage as to cause a chronic ulcer on her body and cataracts on her eyes. She was very hard of hearing, and appears also to have been afflicted with rheumatism. Her death, however, was by pneumonia, which had been superinduced by broken ribs caused by a fall.

Mrs. Stege was a native of Germany and the widow of Christian Stege, who died in 1914, leaving an estate of more than $225,000. After his death, her three sons, Carl, Sam, and Louis, and her daughter, Miss Lillian Stege, lived with her. In 1919, Carl died and Louis married and left the home. Sam Stege was seriously afflicted with epilepsy having spells as often as two and three times a week. He was wholly incapacitated from labor and was the special object of his mother's care and devotion until his death, at the age of 42, in September, 1920. Before this occurred it appears that Mrs. Stege's mental condition had begun to be affected by the infirmities of age and disease. The afflicted son, Sam, became violent, and at the instance of Mrs. Stege's son-in-law, Capt. Chas. F. Huhlein, who was then a member of the board of safety in Louisville, a patrol of police came and removed him to jail, where he was kept about a week, and his mother was not permitted to see him. An inquest was held as to his sanity, which resulted in his being sent to the asylum at Lakeland, where he died about three weeks later. There is some evidence that, although the mother was sorely grieved over his death, it was no more than when she had lost other children. But the preponderating evidence is that these tragic occurrences greatly shocked her and seriously affected her mind. She was ill for a while thereafter, and until her death she continued grief-stricken. She would often refer to him, sit and stare at the floor, shake her head and moan, "Poor Sammy; poor Sammy." She would have crying spells, sometimes bordering on hysteria, and was often depressed and melancholy.

Mrs. Stege for several years before her death had the hallucination that her daughter Lillian—a school

teacher since 1903—was trying to poison her. She had a special lock put on her door, which she kept fastened when within, in expressed fear of her daughter. All parties agree—as embittered as some of them are—that there was no foundation in fact for this idea; and while there is some evidence to the contrary, we think it clear that Miss Lillian was devoted to her mother and was always kind and considerate of her wants and needs.

A number of ladies, who were with her quite a good deal, testify to many peculiar actions symptomatic of weakness of mind, e. g., bad memory, irritableness, anger without provocation; she was excitable, moody, peevish, often unable to carry on a connected conversation, suddenly changing from one subject to another. In playing cards, of which she was very fond, she would always bid on hearts whether she held any of those cards or not, and would become vexed and angry if another would outbid her. On one occasion while at the summer resort in Michigan, she accused the ladies with whom she played cards of stealing $500 from her. Later the money was found in her own pocket. She also related that on one occasion she had made a trip to Europe accompanied by her thirteen children, when she had given birth to only eleven children and the trip had been made with two of them before the others were born.

Two substantial business men of Louisville who knew Mrs. Stege well testify to her feeble mentality and to their experience with her indicating that condition. One of them stated she was not competent to attend to business affairs through lack of judgment and discrimination; that in his opinion she was probably able to handle matters of little consequence, but he considered her condition to be such that, if he were soliciting for charity and she offered to contribute $500, he would decline to accept it, although he would have accepted a $10 gift.

Every one of these lay witnesses expressed the opinion that Mrs. Stege at the time the deed was executed was not mentally capable of understanding its nature, to know the natural objects of her bounty and her obligations to them, and the value and extent of her property and to dispose of it in accordance with a fixed purpose of her own.

Dr. Curran Pope had known Mrs. Stege since 1913. She and her son Sam had been under his care. He testified that the son's death completely upset her; that she

was irritable, emotional, and depressed to the point of hysteria, suffered at times from a state of delusion, having the idea members of her family were persecuting her, and without the slightest grasp of business affairs; her mental activity was very low, having more or less infantile tendencies. The doctor testified as to the diseases with which she suffered—already related—and stated they had a very deteriorating effect; that while Bright's disease does not cause delusions, where one is mentally unsettled it is liable to accentuate, develop, and bring it out; that because of the effect of hardening of the arteries on the circulation it also has a tendency to deteriorate the brain. At no time, testified Dr. Pope, when he had seen her, was she mentally capable or reliable in any sense of the word, nor competent, in his opinion, to execute an instrument of any kind. He expressed the professional opinion that in November, 1922, her mental condition was worse than when he had seen her previously, and therefore she was less likely to have that capacity.

Dr. Robert Wallace, Mrs. Stege's physician for several years before her death, stated she was suffering from the diseases enumerated, "and some others." Hardening of the arteries, he explained, leads to softening of the brain, and the poisons of diabetes affect the mind. She displayed the symptoms of melancholy, delusions, and the like stated, and persons in that condition, he testified, have "depressions of the soul." About a year before her death she had given him her age which showed her to be 86 years old when she died, and on another occasion had made a statement to him showing her to be 84 years old. The doctor declined to answer directly or elaborately questions as to her capacity to make the deed involved, because he stated he had not given attention to her condition with any such object in view; but he would say that any one in her condition could not be trusted with any important matter. However, on cross-examination he testified that as far as his examination of her went there was nothing to lead him to think she was mentally incapable of making a deed or will.

Dr. Leon Solomon called as an expert, testified, with perhaps more detail, as to the effect on the brain and mental processes of the diseases with which Mrs. Stege suffered. In answer to a hpyothetical question reviewing her history, physical condition, and abnormal actions

related, he expressed the opinion that she was wholly unable to make a will or deed, as measured by the usual standard. Dr. Wilmoth, a specialist in diseases of women, testified to the same effect.

The foregoing is the evidence of witnesses introduced by the plaintiffs.

In support of the claim that Mrs. Stege was mentally capable of executing the deed, the defense introduced George W. Stege and Mrs. Huhlein, her son and daughter, and two of the grandsons, all of whom testified that she knew at all times what she was doing and was fully capable of understanding any business transaction, although Louis had attended to all her business. Their evidence is that Mrs. Stege had good health for an old person, and they were not aware that she had Bright's disease, but did know she had diabetes. She had taken the death of Sam very hard, but her grief was no greater than when she had lost other children; that while she would cry and have melancholy spells they would not last long. She never became angry without cause or provocation. Although she walked with a cane because of rheumatism, her failing health did not affect her mental alertness and she was more vigorous mentally than the average person of her age. George Stege testified that his mother and sister Lillian could never get along; that the latter dominated the house and her mother was afraid of her, and for four years she feared Lillian would poison her, but there was no basis for the idea. One elderly lady who saw her quite often testified Mrs. Stege was very intelligent and never acted in an unnatural way; that she and Lillian did not get along together. Sometimes when the witnesses would take up for Lillian, the mother would say to her. ''You know nothing about it,'' and would ''shove me in the ribs.'' Another lady who saw her about once a year expressed the opinion that Mrs. Stege was fully capable of making the deed.

Dr. John D. Trawick, who lived next door, testified that he had seen Mrs. Stege professionally in 1922 before she had gone to Michigan for the summer and treated the diabetic ulcer on her leg. His relation to her was strictly of a surgical nature and he did not care to discuss professionally the subject of the effect of Bright's disease on the mind. He stated, however, that the three diseases with which Mrs. Stege suffered would impair the mental processes, but her impairment was not to the extent that it disqualified her from making a will or

deed, which he regarded her competent to make. He testified that she impressed him as being acute mentally and of strong, decided opinions, and there was no mental impairment beyond what would be expected of any person of her age. Three other physicians had attended Mrs. Stege, but none of them testified.

Mrs. Stege had executed some papers evidencing certain gifts of securities to some of her children in 1916, and two deeds in 1919 and February, 1920. The attorneys who took the acknowledgments as notaries public testify that they considered her mentally competent at those times.

W. W. Crawford, Mrs. Stege's attorney who prepared the deed in question, testified that in the contest over her husband's will in 1915 Mrs. Stege was of material assistance to her counsel, and that he had represented her in several transactions since that time, including the writing of a will in 1921, and he regarded her at all times as fully competent. Her son Louis had attended to all the business of his mother. He saw no difference in her, except her physical condition changing as she grew older. On the occasion the deed involved was made he had gone to Mrs. Stege's home and she had told him how she wished to make the conveyance. In their consultation she asked him if a deed could be set aside as a will could be broken, and he had explained to her the conditions under which it could be done, and she stated she did not want that done like her husband's will had been set aside. He prepared the deed and returned with it for her execution. He read it to her carefully and she made no comment until he read that the conveyance was to her grandchildren, when she stopped him and stated it was to go to her grandsons. Mr. Crawford recalled that she had so informed him, and that the word had been used inadvertently. He had the paper rewritten and the next day returned with the corrected deed, which Mrs. Stege executed after having it read to her. A legal associate of Mr. Crawford accompanied him and testified also as to these circumstances. Mrs. Stege asked the two of them to step out of the room as it embarrassed her to write when others were present as she wrote with difficulty. Both of these gentlemen unequivocally say that in their opinion Mrs. Stege was fully competent to execute the deed.

The foregoing is a very full statement of all the evidence relating to the mental condition of Mrs. Stege.

Eliminating from consideration the testimony of members of the family, as being equalized, it will be noted that the witnesses who were introduced by the plaintiffs were more numerous and in a far better position to know whereof they spoke than those introduced by the defendants.

That the mind of this good woman had become seriously impaired can hardly be denied. As to the degree of impairment, we are almost, if not altogether, convinced that she was incapable of executing the instrument as measured by the usual standards. We do not think that the higher degree of mental capacity that is required of one in order to make a deed as the result of bargaining or where there has been a dealing at arm's length is demanded, for the instrument is of the nature of a testamentary disposition, in which instances less strength of mentality is deemed necessary. But, naturally, when such enfeebled mental condition exists as is here disclosed, it takes less activity and inducement to be regarded as undue influence, and less evidence to prove that that subtle or dominating factor prevailed. We come now to consider that phase of the case.

The instrument which gives away valuable property constituting a considerable portion of the donor's estate is unequal and unfair as measured by equality of treatment of the natural objects of her bounty. When it was made, and at the time of her death, Mrs. Stege had seven living children, namely, the appellants, Henry Stege, Louis Stege, Mrs. Bertha Millekin, and Miss Lillian Stege, and the appellees George W. Stege, Mrs. Louise Huhlein, and Mrs. Eleanor Krieger. A deceased son, Julius, was survived by a son, the appellee Christian Stege. The beneficiaries are two sons of Mrs. Huhlein, two sons of Mrs. Krieger, one son of George Stege, and the grandson, Christian Stege.

The property consists of a lot on the northeast corner of Eighth street and Broadway in Louisville, which portion of the city has been increasing in value in recent years in a remarkable degree. After the will of Christian Stege had been set aside by the courts (see Stege's Ex'rs v. Milliken, 170 Ky. 131, 185 S. W. 824), in the division of his estate this property was allotted to his sons Carl and Sam, and Mrs. Stege inherited it from them. The conveyance was to a trust company in trust, "for the use and benefit of Elizabeth Stege the grantor, during the term of her natural life, the net income to be paid her as it accrues, and for the ten years immediately

following her death, beginning six months thereafter and at the expiration of each succeeding six months during said ten years, the net income shall be equally divided between the grandsons of said Elizabeth Stege who may be alive at the end of each successive six months period, with remainder in fee simple share and share alike per capita not per stirpes, to the grandsons of said Elizabeth Stege who may be living at the expiration of the said ten year period.''

After the death of Carl and the marriage of Louis, in the early summer of 1920, George W. Stege and his family, consisting of his wife and child then about 4 years old, moved into the house with the mother, in which also lived at the time Miss Lillian and the afflicted son Sam. It appears that the mother paid all expenses of the house, except the grocery account of George, and that there were practically two family establishments maintained, although Miss Lillian took her evening meal with her aunt living elsewhere. Mrs. Huhlein lived next door. The contest of the will of the father created very unpleasant relations between different members of the family, but the death of Sam seems to have brought about a reconciliation between the mother and those children who had become estranged. At all times Louis was the business agent, under a power of attorney, and both she and the children had every confidence in him. He was the youngest child and the favorite of the mother, especially after Sam's death. He visited her twice a week. We have already referred to the relations with Lillian. Henry seems to have visited his mother weekly and sometimes oftener. Mrs. Krieger and Mrs. Millekin likewise visited her, but the latter testified that her visits became so unpleasant by reason of the attitude of George and his family that she ceased calling on her, although it appears she would take her for automobile rides. Mrs. Huhlein, next door, was, quite naturally, a frequent caller. The appellants say they were never able to talk privately with their mother, as some member of George's family was always present or nearby. This was denied by them.

After the unfortunate experiences with Sam in which Mr. Huhlein had had a platoon of police remove him from the home, and his subsequent removal to the asylum—which was over the protest of the mother who wished him sent to a private institution—it is made manifest that Mrs. Stege greatly feared and stood in awe of

him. She often stated that he was very powerful and influential in the political and financial affairs of the city, and thought him powerful enough to accomplish anything he might desire.

It is likewise in evidence that upon several occasions George had threatened to leave his mother if she did not do as he wished. Denying any threat to leave, he admits that he talked about doing so, but at his mother's insistence he remained with her because of her fear of Lillian.

Aside from the general statements, pro and con, as to influences existing and exerted by George and Mrs. Huhlein, there are two particular instances showing that George had had sufficient influence to overcome the advice of her son and business agent, Louis. A tenant desired to erect a bakery building on the premises, and Louis advised his mother against permitting it to be done. At the instance of the tenant, George insisted that she should permit it, and she followed his recommendation and wishes in preference to Louis'. On one occasion in the home Louis suggested that they could get $28,000 or $30,000 for the property involved here and she ought to sell it. George admits that he was upstairs, and, overhearing the conversation, came down and interposed an objection, which seems to have brought on a vigorous argument. The result was that the mother again followed George's advice. We are not concerned as to which gave her the better advice but as to the dominance of George's influence over Louis', on whom she had relied for the transaction of all her business. It may be said also that this rather confirms the charge of espionage made by some of the appellants to have existed when they visited their mother.

Coming now to the circumstances leading up to and surrounding the execution of the deed under attack.

Mrs. George Stege testified that on several occasions before the deed was made Mrs. Stege had discussed with her husband and herself the matter of leaving this property to her grandsons, saying that she wanted to leave it to her own blood.

In May, 1922, Mr. Huhlein came to Louis's office very angry and demanded of him, "What do you mean by keeping my children out of their inheritance?" Upon being asked what he meant, Huhlein told him he understood that his mother had asked him to have Mr. Crawford come out and make a deed to the Eighth street and Broadway property to her grandsons and he had

refused. Louis denied this and charged that he had gotten such information from his wife or George; but Huhlein declined to say where he had obtained the information. He left declaring that he would use everything in his power to see that his children got what was coming to them. This incident occurred six months before the deed was executed and at a time when Mrs. Stege's condition of health was very precarious. It is to be said parenthetically that, after the experience with Sam, Mr. Huhlein did not visit in Mrs. Stege's home or have any direct relation with her.

Again, after Mrs. Stege's return from Michigan, some time in October, the month preceding the making of the deed, Mrs. Huhlein also called on Louis and asked what he meant by refusing to have Mr. Crawford come out and make the deed. Louis, denying that his mother had made any such request, had Mrs. Huhlein accompany him into the presence of their mother and she stated she had never made any such request of Louis. Mrs. Huhlein does not deny this conversation. Mr. Huhlein did not testify.

It is of interest to note that for at least six months Mr. Huhlein knew, for perhaps one month Mrs. Huhlein knew, and for an undisclosed period George Stege and his wife knew, that their sons were to get this Broadway property, and that at least the Huhleins knew it was to be by a deed and not by a will. None of Mrs. Stege's other children knew anything about it. George Stege, however, contradicts his wife and states he did not know when his mother had made up her mind to make the deed until one night she discussed it with him and told him of her purpose, also that Louis had refused to call Mr. Crawford. George volunteered to do so, and the next morning called Mr. Crawford to come out. When he came George informed him that his mother had had him called, but he did not know what she wanted with him. Mr. Crawford states that, after learning what Mrs. Stege wanted, he asked George and his wife to leave the room. No reason is given for George being at home during that business hour.

Within a day or so after its execution, the deed was put to record and several of the children received their first knowledge of the transaction from the newspaper report of it. Although Miss Lillian lived in the same house, she knew nothing about the deed until she heard her mother tell Henry on Sunday.

Mrs. George Stege testified: "I think Henry visited there the following Sunday or two Sundays after the deed was made, as was his custom to see his mother on Sunday, and she said to him, 'Henry, did you see my name in the paper?' and he said 'No'; and she said: 'You don't know what I mean; I have given the Eighth and Broadway property to my grandsons.' He said 'Why so favorable to your grandsons?' and she said, 'I didn't want it to go to the Schieles and the Pesels; I wanted it to go to my own blood.' " The reference to the "Schieles and the Pesels" was to the wives of Henry and Louis, as we are informed in brief. There are other incidents of a minor nature shown in this record of 600 pages, specific reference to which would extend the opinion beyond proper bounds.

We have related enough to show a household divided against itself, with the old mother, feeble in body and mind, in the midst of the conflict between two groups of children. On one side is George and his wife in the house with her, and Mrs. Huhlein and her husband next door. On the other side are Louis, her youngest and favorite son, whom she affectionately referred to often as her baby and who attended to her business; Miss Lillian her only unmarried daughter, who resided in the home and was attentive to her, but who did not enjoy her mother's confidence by reason of the dreadful hallucination towards the removal of which the others admit they did nothing because it did not concern them; Henry, who manifested his filial devotion by frequently and regularly visiting her; and Mrs. Millekin who says she could not visit her mother because of the unpleasant conditions, but who did take her driving often. Mrs. Krieger seems to have visited her mother regularly.

It is not shown that there was any special devotion on the part of the grandmother for the grandsons, or indeed, for any of her grandchildren, except George's little boy, of whom she was fond. One of the Huhlein boys had been in South America for 15 years, and the other in Arizona for 5 or 6 years. Christian Stege lived in Chicago. One of the Krieger boys resided in Cincinnati, and the other in Louisville. Why should the grandmother have thus preferred these young men and discriminated against her children in the disposition of a substantial portion of her estate? Of course, the hallucination as to Miss Lillian might explain the discrimina-

tion as to her, but it is inexplicable as to the others, except on the ground of the effect of some influence.

In 1916, after the mother's unsuccessful effort to sustain the will of her husband, she had given to each of the children who stood by her securities of the value of $5,000. These were Henry, Louis, Lillian, and George. In 1919 she had conveyed to Louis property worth about $2,900, which she had inherited. In 1921, she had made a will which she later had destroyed. The contents of the will are not known, except that Mr. Crawford, who prepared it, remembered that Louis was named as a beneficiary, and that the grandsons were not so favored. There had been no change in her relations with them in the meantime so far as the record discloses. The deed could not have been to equalize the Huhlein, Krieger and Millekin families with these four children, for the gifts to them were chargeable as advancements, and the same gift was made to George, whose son was included in this conveyance.

It is difficult to believe that this old lady, as ignorant of business affairs as the evidence shows her to have been—she never wrote a check and did not know the difference between stocks and bonds—could conceive of a trust disposition as intricate as this conveyance. Mr. Crawlord testifies Mrs. Stege told him how she wanted the conveyance to be made and he prepared it accordingly. It appears to be the result of a careful plan, for, as just suggested, the value of the property could not be charged as advancements in the settlement of her estate, except as to Christian Stege. Indeed, it might prove to be a disadvantage to him by reason of the disfeasance provision.

The value of Mrs. Stege's estate does not appear in the record, but, by a statement in brief of counsel for the appellees, it is suggested that the equalization with the advancements consumed nearly all of her estate other than this property, which was valued at the date of the deed at about $27,000 and when depositions were taken early in 1928 at between $45,000 and $55,000.

As suggested in the beginning, the law of cases of this character is well settled and needs no restatement. Where the deed is in effect a testamentary disposition— as is this one—the same measurement of capacity and freedom as is required for the execution of a will should be applied. Best v. House (Ky.), 113 S. W. 849; Wood v. Moss, 176 Ky. 419, 195 S. W. 1077; Snyder v. General

Conference Board of Education of M. E. Church South, 205 Ky. 812, 266 S. W. 661. Among other cases setting forth the degree of mental weakness considered sufficient to show incapacity to make will or deed are: Sykes v. Hurd, 195 Ky. 560, 242 S. W. 853; Chrisman v. Quick, 174 Ky. 845, 193 S. W. 13, 14; Gillock v. Williams, 199 Ky. 169, 250 S. W. 836; Rounds v. Rounds, 220 Ky. 98, 294 S. W. 785; Thompson v. Jordan, 222 Ky. 788, 2 S. W. (2d) 640; Hagedorn v. Scott, 228 Ky. 582, 15 S. W. (2d) 479; Stewart v. Douglas, 235 Ky. 121, 29 S. W. (2d) 637; Cases involving the effect of an hallucination or delusion on testamentary capacity are: Lancaster v. Lancaster's Ex'r, 87 S. W. 1137, 27 Ky. Law Rep. 1127; Layer v. Layer, 110 Ky. 542, 62 S. W. 15, 22 Ky. Law Rep. 1936; Wigginton's Ex'r v. Wigginton, 194 Ky. 385, 239 S. W. 455; Woodruff's Ex'r v. Woodruff, 233 Ky. 744, 26 S. W. (2d) 751. Adding to the factor of weak mentality is to be considered the evidence of the donor having been unduly influenced to execute the instrument. For the rule to be applied under such conditions, see, among many cases, additional to those cited; Walls v. Walls, 99 S. W. 969, 30 Ky. Law Rep. 948; Barber's Ex'r v. Baldwin, 138 Ky. 710, 128 S. W. 1092; Lisle v. Couchman, 146 Ky. 345, 142 S. W. 1023; Beard v. Beard, 173 Ky. 131, 190 S. W. 703, Ann. Cas. 1918C, 832; Helm's Guardian v. Neathery, 226 Ky. 42, 10 S. W. (2d) 474; Combs v. Roark, 206 Ky. 454, 267 S. W. 210; Gregg v. Hedges' Guardian, 227 Ky. 268, 12 S. W. (2d) 854; Mossbarger v. Mossbarger's Adm'x, 230 Ky. 230, 18 S. W. (2d) 997. The exercise of effort which produces the will or deed need not be by the beneficiary directly, but may be through agency (Stewart v. Douglas, supra), or by a third person (Pinson v. Stratton, 220 Ky. 557, 295 S. W. 859), or by one to keep another from inheriting (Wall v. Dimmitt, 114 Ky. 923, 72 S. W. 300, 24 Ky. Law Rep. 1749, and subsequent appeals).

In this case the evidence is overwhelming that the grantor or donor had by reason of senility and the ravages of disease, accentuated by the great shock suffered from the tragic occurrences relating to her afflicted son, become very weak mentally, as was manifested by her hallucinations and other symptomatic actions. This condition made her peculiarly subject to fear—that most potent force with a frail and childish mind—fear of her son George and his wife that they would leave her alone with Lillian; fear of her daughter, Mrs. Huhlein, that her

husband was powerful and forceful enough to do with her anything that his wife might wish. "The concessions of the weak are the concessions of fear,", wisely declared the great philosopher and statesman, Edmund Burke.

On the one side were weakness and fear; on the other hostility, self-desire, opportunity, influence and power. The exercise of these forces must in nearly every case be proven by circumstances. That influences were being brought to bear on the old mother it seems clear to us. The result itself is strong proof of their effect— a gift by means of an intricate conveyance (which avoids the law of advancements), of valuable property constituting a substantial portion of the donor's estate; discrimination against those who were by nature and by special manifestations of affection the peculiar objects of her bounty; and bestowal of it on young men who, though of her own blood, had never evinced any special devotion or attention to their grandmother and for whom she entertained no reciprocal relations of that degree, except perhaps George Stege's little boy.

In considering this record the court has regarded only such evidence as is held to be competent in Combs v. Roark, 206 Ky. 454, 267 S. W. 210, as interpreted and amplified in Russell v. Tyler, 224 Ky. 511, 6 S. W. (2d) 707.

The appellees also rely upon the decision of the chancellor in their favor and invoke the rule respecting the consideration to be given it. That rule, stated in the briefest way, is that this court reaches its own conclusion as to the facts in equity cases, although the chancellor's opinion receives great consideration, and, if doubt exists in our mind as to what is the right and proper conclusion, his judgment is thrown in the balance and will be adopted. Oliver v. Noe, 232 Ky. 809, 24 S. W. (2d) 592.

The chancellor in this case found weakness of mind to have existed, but that there was an absence of evidence of the exercise of undue influence. He declared that, if there were any substantial indication that such influence had been exerted, it would be entitled to great weight. He expressed the opinion: "There is not the slightest indication that it (the deed) was suggested to her by anyone. So far as I can recall it is not shown that any member of her family had any knowledge of her purpose until after it was accomplished."

The careful and learned judge evidently overlooked some of the evidence which we have related showing the admission of frequent discussions as to the making of the conveyance with George Stege and his wife and the the actions of Mr. Huhlein six months before and of Mrs. Huhlein one month before its execution in which they vigorously condemned Louis for obstructing it, as they had been informed, and the further declaration of the father of two of the beneficiaries that he would use every power at his command to accomplish it.

Upon a very careful consideration of the entire record, the court concludes that the judgment should be reversed, which is done, with directions to set aside the deed.

Whole court sitting.

### DISSENTING OPINION OF JUSTICE WILLIS

I am unable to concur with the court in a reversal of the judgment upholding the deed made by Mrs. Stege to her grandsons. Her capacity to make the deed is substantially conceded, and the evidence that is said to show undue influence, fully stated in the opinion, does not convince me that the chancellor was not correct in his conclusions. The question involved is one of fact and an elaboration of my views would serve no useful purpose. For that reason I am content merely to declare my dissent from the decision.